Irving FELTON,

v.

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY.

Civ. A. No. 89–3349.

United States District Court, E.D. Pennsylvania.

Feb. 19, 1991.

Gregory Holston, Philadelphia, Pa., for plaintiff.

Brian Kandell, Francis J. Connell, III and Maureen L. Hogel, Drinker, Biddle & Reath, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DuBOIS, District Judge.

Before the Court for a second time is the Motion of defendant, the Southeastern Pennsylvania Transportation Authority ("SEPTA"), for Summary Judgment. In the Complaint, Irving Felton ("plaintiff") seeks damages for personal injuries allegedly sustained while he was employed by SEPTA as a trackman for its City Transit Division. Plaintiff brings his action under the Federal Employer's Liability Act (the "FELA"), which grants to every employee of a "common carrier by railroad" engaged in interstate commerce the right to recover for injuries resulting from the negligence of an employer railroad.[1] SEPTA's Motion for Summary Judgment asserts that plaintiff was employed exclusively by its City Transit Division which is not a "common carrier by railroad" under the FELA. As such, SEPTA maintains that plaintiff's recovery is limited to that provided under the Pennsylvania Workmen's Compensation Act. 77 P.S. §§ 1 *et seq.*

On January 31, 1990 the Court granted Summary Judgment in favor of SEPTA and issued a Memorandum. It reasoned that plaintiff, as a trackman for SEPTA's City Transit Division, was not an employee of a "common carrier by railroad" within the meaning of the FELA. Thereafter, plaintiff filed a Motion for Reconsideration, in which he argued that he was an employee of SEPTA—a single integrated employer providing both local and regional transportation services—and that the Court erred in finding he was an employee of SEPTA's City Transit Division. The Motion for Reconsideration was granted and, as requested by plaintiff, additional discovery permitted.

Having reviewed the issues for a second time, it remains the finding of the Court that plaintiff worked exclusively within SEPTA's City Transit Division. The Court further finds that SEPTA's City Transit Division, although part of the commuter authority known as SEPTA, is a separate operational entity which Congress did not

---

1. FELA, 45 U.S.C. § 51, in relevant part provides:

    Every common carrier by railroad while engaging in commerce between any of the several States ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury ... resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances,

    machinery, track, roadbed, works, boats, wharves, or other equipment.

    Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter.

intend to classify as a "common carrier by railroad" subject to the FELA. Accordingly, SEPTA's Motion for Summary Judgment will be granted. Because additional issues requiring comment have been raised on reconsideration, the prior Memorandum of this Court will be vacated.

## I. BACKGROUND

SEPTA is a provider of public transportation services. Created pursuant to the Pennsylvania Urban Mass Transportation Law, 55 P.S. §§ 600.301—600.343, SEPTA was established as part of an effort to develop metropolitan transportation authorities within the Commonwealth. As it presently exists, SEPTA is comprised of four divisions: the Red Arrow, the Frontier, the City Transit and the Regional Rail Divisions. The first three divisions operate intrastate, with the City Transit Division providing services exclusively within the Philadelphia urban area. The Regional Rail Division is the sole provider of interstate regional commuter rail services.

Plaintiff was hired by SEPTA on October 4, 1977 as a Maintenance Trainee Laborer. He worked exclusively within the City Transit Division until the accident at issue in this case which occurred on June 16, 1987. At that time, he was employed as a trackman, and was working on a trackbed used solely by the Market–Frankford subway line, an intra-city line, at the subway station at 11th and Market Streets in Philadelphia. Plaintiff's injury occurred while he was lifting a tie from a subway track.[2]

■ As a result of the accident, plaintiff first was found to be temporarily disabled and was awarded worker's compensation benefits pursuant to the Pennsylvania Workmen's Compensation Act, 77 P.S. §§ 1, *et seq.* In June of 1989 it was determined that plaintiff was totally disabled and his benefits were adjusted accordingly. Shortly before that determination was

made, and despite the fact that plaintiff had received worker's compensation benefits for almost two years, plaintiff brought suit against SEPTA, claiming that his injuries were covered by the FELA rather than the Pennsylvania Workmen's Compensation Act.[3]

## II. DISCUSSION

### A. *Review upon Motion for Summary Judgment*

Summary judgment is appropriate in those cases where the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 341 (3d Cir.1990). Where one party submits evidence in support of a motion for summary judgment, the burden shifts to the other party to show the existence of triable issues. Mere allegations, bare assertions or suspicions are not sufficient to defeat a motion for summary judgment. *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Summary judgment may be granted if the evidence presented by the non-movant is merely colorable or is not significantly probative of the issues. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the Court analyzes the facts in the light most favorable to the non-moving party. *Schafer v. Board of Educ.*, 903 F.2d 243, 247 (3d Cir.1990).

### B. *The Scope of FELA Coverage*

■ The FELA provides the exclusive source of recovery for employees of inter-

2. The Court rejects as unsupported plaintiff's statements that he was employed at the time of his accident as a "general helper" servicing both SEPTA's City and Regional Rail Divisions.

3. Although plaintiff's Complaint does not specifically state that he is not entitled to Pennsylva-

nia worker's compensation benefits, case law makes clear that individuals covered by the FELA are not eligible for any such additional compensation provided by State law. *See New York Railroad Co. v. Winfield*, 244 U.S. 147, 37 S.Ct. 546, 61 L.Ed. 1045 (1917).

state railroads injured or killed during the course of their employment. Enacted in 1908 when railroad technology was still in its infancy, the statute was described by the Supreme Court as a Congressional

> response to the special needs of *railroad workers* who are daily exposed to the risks inherent in *railroad work* and are helpless to provide adequately for their own safety.

*Sinkler v. Missouri Pacific R.R. Co.*, 356 U.S. 326, 329–30, 78 S.Ct. 758, 761–62, 2 L.Ed.2d 799 (1958), (*citing Tiller v. Atlantic Coast Line R. Co.*, 318 U.S. 54, 65, 63 S.Ct. 444, 450, 87 L.Ed. 610 (1943)) (emphasis added). The FELA evidenced Congress's recognition that human injury was "an inescapable expense of railroading." It's goal was to shift that expense equitably from worker to carrier. *Id.*, (*citing Kernan v. American Dredging Co.*, 355 U.S. 426, 438, 78 S.Ct. 394, 401, 2 L.Ed.2d 382 (1958)).

■ To recover under the FELA, a plaintiff must establish: (1) that the defendant is a common carrier by railroad engaged in interstate commerce; (2) that the plaintiff was employed by the defendant with duties furthering such commerce; (3) that the plaintiff's injuries were sustained while he was so employed; and (4) that the injuries were the result of the defendant's negligence. *See, e.g., Fowler v. Seaboard Coastline R.R. Co.*, 638 F.2d 17 (5th Cir. Unit B Feb. 23, 1981); *Betoney v. Union Pacific R.R. Co.*, 701 P.2d 62 (Colo.App. 1984).

The threshold issue raised by SEPTA's Motion for Summary Judgment is whether plaintiff was employed by a "common carrier by railroad" engaged in interstate commerce. SEPTA argues that plaintiff was not so employed because he worked exclusively in *intra* state commerce as a trackman for SEPTA's City Transit Division. Plaintiff disputes this assertion, stating that it is improper to treat SEPTA's City Transit Division as a distinct entity. He claims that SEPTA is a single employer,

operating an "integrated" network of local and regional transportation. Because SEPTA's Regional Rail Division falls within the FELA's coverage, plaintiff asserts that all of SEPTA must be viewed as a common carrier by railroad.[4]

■ Plaintiff admits that urban rapid transit systems, often referred to as subways or street railways, are not "common carriers by railroad" for purposes of the FELA. Moreover, the extension of urban transit lines across state boundaries does not convert a subway or street railway into a "common carrier by railroad." *See, e.g., Omaha v. Council Bluffs Street Railway Co. v. Interstate Commerce Commission*, 230 U.S. 324, 33 S.Ct. 890, 57 L.Ed. 1501 (1913); *Ferguson v. Philadelphia*, 113 F.Supp. 275 (E.D.Pa.1952), *aff'd*, 205 F.2d 520 (3d Cir.), *cert. denied*, 346 U.S. 867, 74 S.Ct. 107, 98 L.Ed. 377 (1953). As defined by one court:

> [A] street railway is local, derives its business from the streets along which it is operated, and is in aid of the local travel upon those streets; while a commercial railway usually derives its business, either directly or indirectly, through connecting roads, from a large area of territory, and not from the travel on the streets of those cities ... along which they happen to be constructed and operated.

*Mangum v. Capital Traction Co.*, 39 F.2d 286, 287 (D.C.Cir.1930).

■ Given that SEPTA's City Transit Division operates exclusively within the City of Philadelphia, it is clear that it is not a "common carrier by railroad" subject to the FELA. The question, therefore, is whether SEPTA's operation of a regional rail line is sufficient to convert SEPTA's entire operation, including its City Transit Division, into that of a "common carrier by railroad." The Court concludes that neither the law nor the facts will support such a result. It therefore will not extend FELA benefits to employees of SEPTA's City Transit Division.

---

**4.** For purposes of the present litigation, SEPTA concedes that employees of its Regional Rail Division are covered by the FELA.

### C. Congress Did Not Intend to Grant FELA Benefits to Employees of Local Transit Systems Operating Regional Rail Lines

SEPTA first assumed operation of its Regional Rail Division following passage of the Northeast Rail Services Act of 1981 ("NERSA"). NERSA mandated the withdrawal of Consolidated Rail Corporation ("Conrail") as a provider of regional commuter rail services, 45 U.S.C. § 744a, and permitted State, local and regional commuter authorities, such as SEPTA, to assume the independent operation of Conrail's regional rail lines. 45 U.S.C. §§ 584, 586, 745.

■ In providing for the transfer of Conrail's commuter operations under NERSA, Congress addressed in detail the rights of those rail workers who were to become the employees of local commuter authorities. For example, Congress defined the employment rights of former Conrail personnel, ordered collective bargaining with their unions, and provided for the assumption of liability in personal injury claims. 45 U.S.C. §§ 588, 590, 797g and 797h. At no point, however, did Congress evidence an intent to affect the status of city transit workers under NERSA. Nor did it extend to such workers benefits provided under federal laws, such as the FELA, developed expressly for the protection of railroad employees.

■ Concurrent with the enactment of NERSA, Congress amended another statute governing the provision of regional rail services. The Rail Passenger Service Act of 1970, 45 U.S.C. §§ 581–591, as amended, established the Amtrack Commuter Services Corporation, and authorized it, as well as State, local and regional commuter authorities, to acquire Conrail commuter lines. Consistent with NERSA, the Amendment of this Act did not serve to

sweep local transit authorities within the Federal regulatory framework. Rather, § 591 of the Rail Passenger Service Act provided only that:

> [a]ny commuter authority operating commuter service under this subchapter shall be subject to applicable laws with *respect to such service,* including, but not limited to, the Railway Labor Act ... the Railroad Retirement Act of 1974 ... the Railroad Retirement Tax Act ..., and the Railroad Unemployment Insurance Act....

45 U.S.C. § 591 (emphasis added).

Under § 591, commuter authorities such as SEPTA which assumed operation of regional lines became subject to all laws, including the FELA, previously applicable to Conrail. Such "applicable laws," however, govern commuter authorities only with regard to their *commuter services.*[5] Section 591, read in accordance with its plain meaning, does not subject to federal regulations non-commuter services, such as those within SEPTA's City Transit Division.

■ Lastly, Congress's intent not to extend FELA benefits to SEPTA's Transit Division employees was evidenced by the enactment of the Federal Railroad Safety Authorization Act of 1982, 45 U.S.C. §§ 13, 431, 438, 444, amending the original Federal Railroad Safety Act of 1970, 45 U.S.C. §§ 421 *et seq.* The 1982 Act granted the Secretary of Transportation the power to regulate "all areas of railroad safety," including

> the safety of commuter or other short-haul rail passenger service in a metropolitan or suburban area, [and] any commuter rail service which was operated by the [Conrail] as of January 1, 1979.

45 U.S.C. § 431(k).[6]

In furtherance of this goal, it authorized the issuance of

---

**5.** The definition of "commuter service" includes regional "rail passenger service ... whether within or across the geographical boundaries of a State...." 45 U.S.C. § 702. By contrast, the term "transit service" generally refers exclusively to the subway or street railway operations

within a single urban community. *Omaha,* 230 U.S. 324, 33 S.Ct. 890.

**6.** Plaintiff argues that the 1987 Amendment of § 431(k) evidences a Congressional intent to broaden federal regulatory power beyond that which was allowed by the 1982 Act. Incorporat-

rules, regulations, orders, and standards as may be necessary to insure that the construction, maintenance, and operation of railroad passenger equipment maximize safety to rail passengers.

45 U.S.C. § 431(h)(1)(A).

■■■ The legislative history of the Federal Railroad Safety Authorization Act makes clear that Congress did not intend to regulate intracity transit units operated by commuter authorities. Prior to the passage of the Amendments, the House Subcommittee on Commerce, Transportation, and Tourism held hearings to discuss whether the Federal Railroad Administration (FRA) possessed jurisdiction to regulate the safety of Conrail regional rail lines acquired by local transit authorities.[7] SEPTA representatives testified at the hearings, and took the position that its regional rail lines should not be subject to FRA regulation. They argued that following the passage of NERSA, such lines were no longer part of a regional railroad, but had been incorporated into SEPTA's "transit system." *Commuter Rail Safety Hearings on H.R. 4278 before the Subcommittee on Commerce, Transportation and Tourism,* 97th Cong., 2d Session, 25–26, 445–46 (1982).[8]

Congress's resolution of the problem highlights the essential flaw underlying plaintiff's argument. The subcommittee rejected the argument that a commuter authority, such as SEPTA, operating both regional rail and local transit services had to be treated as a single unit. Rather, it found that the goals of NERSA, as well as of the Federal Railroad Safety Authorization Act, were better effectuated by granting the FRA jurisdiction over SEPTA's regional commuter lines, but denying it authority to regulate purely intrastate services. The Report of the full Committee on Energy and Commerce following the Hearings thus states that the amendments enacted as 45 U.S.C. § 431(k) would exclude from FRA jurisdiction "rail rapid transit operations such as subways or trolley lines." H.R. Rept. No. 97–571, Part 1, 97th Cong., 2d Session, *reprinted in,* 1982 U.S. Code Cong. & Admin.News 4499, 4523–24.

SEPTA admits that the Federal Railroad Safety Authorization Act does not specifically refer to the FELA. Nevertheless, it argues, and the Court agrees, that it would be illogical to subject local transit systems, such as SEPTA, to the FELA, while at the same time exempting those systems from the federal safety guidelines established by the FRA.

### D. *SEPTA's City Transit Division Is Not Part of an Integrated System Constituting a Common Carrier by Railroad*

Plaintiff does not argue that NERSA, the Railway Passenger Act, or the Federal Railroad Safety Authorization Act necessarily extends FELA coverage to the employees of local transit units which acquired Conrail's regional lines. In fact, he admits that the transit authorities of New Jersey, New York and Massachusetts, although they operate regional rail services, are not "common carriers by railroad" within the meaning of the FELA. The difference between these other authorities and SEPTA, he argues, is that SEPTA is an entirely integrated organization. SEPTA appears to be the only local authority which manages its city transit and regional rail lines as divisions under one corporate

---

ed in § 431(e), the Amendment excludes from the definition of the term "railroad" all "rapid transit operations within an urban area that are not connected to the general railroad system of transportation." Plaintiff argues that SEPTA's City Transit Division falls within § 431(e)'s definition of a "railroad" because it *is* "connected" to the "general railroad system of transportation." For the reasons stated in Part II–D, below, the Court rejects this assertion, and holds that the Amendment does not bring SEPTA's City Transit Division under the FELA.

7. In 1981 SEPTA experienced three accidents on its regional rail lines. The FRA initially refused to take action because it believed that the tracks were operated by a "transit authority" not a "railroad".

8. SEPTA's position was buttressed by the Seventh Circuit's decision in *Chicago Transit Authority v. Flohr,* 570 F.2d 1305 (7th Cir.1977), holding that the term "railroad" does not include urban rapid transit systems.

umbrella rather than through separate operational entities.[9]

■ To succeed on this integration theory, plaintiff must demonstrate that SEPTA's entire operation, including its City Transit Division, is a "common carrier by railroad." *Lone Star Steel Co. v. McGee*, 380 F.2d 640, 647 (5th cir.), *cert. denied*, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967).[10] In support of his claim, plaintiff relies on *Hedderman v. Staten Isl. Rapid Transit Oper. Auth.*, 593 F.Supp. 1141 (E.D.N.Y.1984), holding a local transit company subject to the FELA because it maintained freight tracks for use in interstate commerce. He also cites *Washington Railway & Electric Co. v. Scala*, in which the Supreme Court affirmed with little discussion a lower Court holding that a carrier incorporated as an ordinary railway company, and operating interstate, was a "suburban railroad common carrier of passengers" subject to the FELA. 244 U.S. 630, 37 S.Ct. 654, 61 L.Ed. 1360 (1917).

Other authority, however, cited by defendant, supports a contrary result. In *Borelli v. International R. Co.*, 240 N.Y. 54, 147 N.E. 356, *cert. denied*, 269 U.S. 557, 46 S.Ct. 19, 70 L.Ed. 410 (1925), the Court held that the family of a railway employee killed while working on an intrastate transit line was not entitled to compensation under the FELA, merely because the employer also owned a rail line into Canada. It stated:

*The fact that a railroad operates one line engaged in interstate commerce does not result in the conclusion that all other lines owned by it are so engaged.* They may be used as separate and independent units. If that be so here, there is no more connection between the two lines than if they were owned by two corporations which had between themselves some transfer and accounting system.

*Borelli*, 147 N.E. at 357 (emphasis added). Similarly, in *Mangum v. Capital Traction Co.*, 39 F.2d 286 (D.C.Cir.1930), the Court of Appeals for the District of Columbia distinguished *Scala*, and held that a Washington, D.C. transit company did not become a common carrier by rail subject to the FELA, merely because it operated a single line into a nearby Maryland community.

■ There are two substantial problems with relying on any of the cases using a common entity or integration test. First, none of the authorities cited by either party confront the impact of NERSA on the operation of local transit authorities. As such, they do not come to terms with the fact that Congress could have but did not extend FELA coverage to local transit workers not previously employed by Conrail. Secondly, even if the Court were to apply an integration test in deciding whether to allow plaintiff to proceed under the FELA, plaintiff has not produced any credible evidence to rebut SEPTA's claim that it is not integrated.

The chief basis of support for plaintiff's integration argument is a 1985 Report (the "Report") prepared for SEPTA by independent analysts, and setting forth SEPTA's intent of creating an integrated system of local and regional rail transportation. In describing SEPTA, the Report uses the term "integrated" on numerous occasions. Particularly, it praises SEPTA's decision to operate its City and Regional Rail divisions as a single corporation. It distinguishes SEPTA from other local transit authorities which operate their regional rail services through subsidiary entities. The Report also notes critically that, at the time of writing, there was no single person or group of persons performing upper

---

9. The New Jersey, New York and Massachusetts transit authorities operate their regional rail services through separate organizations.

10. Plaintiff argues that the four factors applied in *Lone Star* to define "a common carrier by railroad" should be used to determine the outcome of the instant matter. The Court finds that the issue presented in *Lone Star*, whether

the operation of an in-plant railroad amounted to the operation of a "common carrier by railroad," is inapposite to the issue raised by plaintiff in this case. Moreover, although *Lone Star* was cited with approval in *Wheeling–Pittsburgh Steel Corp. v. McCune*, 836 F.2d 153, 161 (3d Cir.1987), the four considerations have never been adopted as a test by this circuit.

management functions exclusively for the Regional Rail Division.

While at first blush the Report appears to favor plaintiff, a closer reading reveals it does not support his claim. First, the Report was written in 1985 and speaks largely in terms of future projections and goals. It is not evidence of the condition of SEPTA at the time of plaintiff's injury or of SEPTA today.

Secondly, the Report itself speaks of significant differences between the City Transit and Regional Rail Divisions. It states that different unions represent the City Transit and Regional Rail Division employees, that they receive different retirement benefits, and that they are subject to different pay scales and seniority systems. In fact, the Report itself does not concern "SEPTA" but rather SEPTA's Regional Rail Division. Entitled a *Report on the Regional High Speed Lines,* its very name indicates an organizational distinction between SEPTA's City Transit and Regional Rail Divisions.

Thirdly, and perhaps most importantly, the Report recognizes the importance of allowing regional rail employees to maintain an identity separate from that of local transit workers. The Report notes that Conrail workers historically viewed themselves as part of a special railroad tradition. It encourages SEPTA to maintain that tradition by allowing the regional rail workers to wear their old uniforms and by referring to them as part of the "Regional High Speed Rail System." [11]

Plaintiff also cites SEPTA's contracts with certain employee unions in support of his integration theory. However, the depositions of Charles Thomas, SEPTA's Chief Operations Officer, and Francis X. Hutchinson, Chief Officer for Labor Negotiations, disclose that plaintiff simply misreads these contracts. In fact, SEPTA city and regional workers are represented by different unions which negotiate for different employment conditions. Proof of the separation in work forces is evidenced, for example, by the fact that a worker wishing to move between the Regional Rail and City Transit Divisions may not simply transfer jobs, but must resign his or her post in one division and reapply for the desired job in the other division. Moreover, in 1983, the rail unions called a strike that lasted 108 days and resulted in the suspension of Regional Rail Division services. City Transit Division employees, however, did not join in this strike, and local services continued to operate. Also, regional rail employees contribute to the Railroad Retirement Fund and are exempt from the Social Security tax, whereas city transit employees pay Social Security taxes and are not eligible for Railroad Retirement benefits.

Lastly, plaintiff claims that SEPTA's physical structure is sufficient evidence that SEPTA is a single railroad. Plaintiff notes that passengers may transfer between regional and local lines, that SEPTA's Fern Rock facility operates as a servicing station for both city subways and regional trains, and that there exists at the Fern Rock yard a single access track which "connects" subway rails carrying City Transit Division cars to a track used by the Regional Rail lines. Plaintiff argues that such physical linkages demonstrate that SEPTA's City Transit Division is a "common carrier by railroad." The term "railroad" he notes, excludes only "rapid transit operations within an urban area that are *not* connected to the general railroad system of transportation." 45 U.S.C. § 431(e) (emphasis added).

■■■ A *de minimis* relationship to the operation of a railroad is insufficient to trigger the FELA. *Borelli,* 147 N.E. 356. Plaintiff's proofs ignore the substantial evi-

---

**11.** At the time the report was written, SEPTA envisioned the incorporation of the Conrail lines into the existing SEPTA transit system. The report states:

> [SEPTA] strongly believes [it] should be viewed as a transit operation and not as a railroad. Thus the terms and conditions of work for individuals employed by Conrail and transferred to SEPTA should not be passed down to SEPTA.... With due respect for craft dignity and tradition, the rail operation will become a segment of an area transit system and it must be operated accordingly.

dence produced by SEPTA that the single access track at Fern Rock is used only for the transport of freight equipment, cannot be used for the transport of subway cars, and does not in any sense connect SEPTA's City Transit Division to the "general railroad *system* of transportation." 45 U.S.C. § 431(e) (emphasis added). The FRA has never exerted its jurisdiction over the Fern Rock yard or those portions of the shop used for working on subway cars. Indeed, SEPTA's subway cars and regional rail trains cannot run on the same tracks because they require different voltages and rely on different power sources.

Plaintiff's argument also ignores the express intent of Congress that under NER-SA, the assumption of regional commuter operations by local authorities was intended to create an "economically viable system capable of providing adequate and efficient rail service...." 45 U.S.C. § 701(b)(2). From the time that SEPTA assumed operation of Conrail regional commuter operations in 1983, it consistently refused to extend the employment benefits enjoyed by Conrail's rail workers to its local transit employees. SEPTA's decision was based upon its belief that extending such benefits to its transit employees would make SEPTA's continued operation financially impossible.[12] Plaintiff has produced no evidence that SEPTA overstates the financial effect of granting these benefits, particularly FELA coverage, to its City Transit employees.

Thus, plaintiff's argument essentially elevates form over substance, giving too much weight to the few ways in which the operation of SEPTA's City and Regional divisions are merged for purposes of efficiency, and too little weight to their different origins and purposes. In light of the potential hardship to SEPTA and the absence of evidence that Congress intended to provide a federal right of recovery to local transit employees, the Court will not jeopardize the efficient and economical operation of SEPTA's City Transit Division by extending FELA coverage beyond its present scope.

### E. Plaintiff was Not Employed in Furtherance of Interstate Commerce

Because the Court has determined that SEPTA's City Transit Division is not a "common carrier by railroad" it need not discuss at length the second issue of whether plaintiff was employed in furtherance of interstate commerce. The position of "trackman", formerly held by plaintiff, exists in both the City Transit and Regional Rail Divisions. Trackmen for the City Transit Division work exclusively on subway tracks, whereas trackmen for the Regional Division are employed solely to maintain and repair the Regional Rail Division Lines. Plaintiff's one page affidavit stating that he worked on SEPTA's Regional Rail Division lines is internally inconsistent, and does no more than reiterate the bare allegations of his briefs.[13] Standing alone, as it does, it does not amount to the kind of credible evidence required to withstand a motion for summary judgment.

### III. CONCLUSION

For the above-stated reasons, the Court finds that plaintiff worked exclusively within SEPTA's City Transit Division, and that this division, although part of the commuter authority known as SEPTA, is a separate operational entity which Congress did not intend to classify as a "common carrier by railroad" subject to the FELA.

12. The FELA provides for no ceiling on recovery and entitles plaintiffs to damages for pain and suffering and other damages not allowed under the Pennsylvania Workmen's Compensation Act.

13. The first and third paragraphs of the affidavit, dated February 16, 1990, state that plaintiff is employed by SEPTA as a "General Helper" and is required to perform duties for both the City Transit and Regional Rail Division. These duties allegedly include "repair of railroad track, maintain, secure and distribute supplies to be used on both the city and regional rail lines [sic]; and monitor tests for applicants for SEPTA city and regional rail lines." By contrast, the second paragraph names plaintiff as the "General manager [sic]" of SEPTA who "oversees all operations for all divisions."

Accordingly, defendant's Motion for Summary Judgment will be granted.

An appropriate order will follow.

### ORDER

AND NOW, to wit, this 19th day of February, 1991, upon further consideration of the Motion of Defendant, Southeastern Pennsylvania Transportation Authority, for Summary Judgment, and the supplemental submissions of the parties following the granting of the Motion of plaintiff, Irving Felton, for Reconsideration, and good cause appearing, IT IS ORDERED that the Motion of defendant, Southeastern Pennsylvania Transportation Authority, for Summary Judgment is GRANTED. Judgment is hereby entered in favor of defendant, Southeastern Pennsylvania Transportation Authority, and against plaintiff, Irving Felton.

IT IS FURTHER ORDERED that this Court's Memorandum of January 31, 1990, is vacated.