**Irving FELTON, Appellant,**

v.

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Appellee.**

**No. 91–1195.**

United States Court of Appeals, Third Circuit.

Argued Aug. 5, 1991.

Decided Dec. 23, 1991.

As Amended Jan. 6, 1992.

Gregory G. Holston, (argued), Philadelphia, Pa., for appellant.

Francis J. Connell III, (argued), Maureen L. Hogel, Drinker Biddle & Reath, Philadelphia, Pa., Brian J. Kandell, Southeastern Pennsylvania Transp. Co., Philadelphia, Pa., of counsel, for appellee.

Before MANSMANN and ALITO, Circuit Judges and DIAMOND, District Judge *.

## OPINION OF THE COURT

DIAMOND, District Judge.

In this appeal we review the district court's order granting defendant's motion for summary judgment. In granting the motion, the district court held that Irving Felton was not entitled to sue his employer, Southeastern Pennsylvania Transportation Authority ("SEPTA"), under the Federal Employers Liability Act, 45 U.S.C. §§ 51 *et seq.* (1986) ("FELA"), to recover compensation for job related injuries. *See Felton v. Southeastern Pennsylvania Transportation Authority*, 757 F.Supp. 623 (E.D.Pa. 1991).

For the reasons which follow, we find that the district court correctly concluded that FELA may not be invoked by Felton because his employment by SEPTA was restricted to its City Transit Division, a wholly intraurban entity which is neither a "common carrier by railroad" engaged in interstate commerce within the meaning of FELA, nor so integrated with such an entity as to become subject to the provisions of that Act. Accordingly, we will affirm.

## I.

### A.

The scope of our review of a district court order granting summary judgment is plenary. *Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 280 (3d Cir.1988). In order to prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Miller v. Eichleay Engineers*, 886 F.2d 30, 35–36 (3d Cir.1989). This is an appropriate case for summary judgment since the dispute is not over the operative facts, but as to the legal effect thereof.

### B.

SEPTA is comprised of four divisions: the Red Arrow, the Frontier, the City Transit, and the Regional Rail.[1] The first three provide purely intrastate transportation. The City Transit Division offers subway, trolley and bus transportation services exclusively within the Philadelphia urban area and it consists essentially of the property and equipment of the former Philadelphia Transportation Company, which SEPTA acquired in 1968. Interstate regional commuter rail service is provided by the Regional Rail Division, whose employees SEPTA concedes for purposes of this case are covered by FELA. *Felton*, 757 F.Supp. at 626 and 627 n. 4.

On June 16, 1987, Felton, who had been employed by the City Transit Division since October 4, 1977, was injured while working on a trackbed used exclusively by that division's Market–Frankford Subway Line, an intracity line. As a result of the accident,

---

* Honorable Gustave Diamond, United States District Court for the Western District of Pennsylvania, sitting by designation.

1. SEPTA was formed by an act of the Pennsylvania Legislature in 1963 pursuant to the Pennsylvania Mass Transportation law, 55 Pa.Stat.Ann. §§ 600.301 *et seq.* SEPTA qualifies as a "commuter authority" under 45 U.S.C. § 502(8).

Felton was awarded worker's compensation benefits pursuant to the Pennsylvania Workers' Compensation Act, 77 Pa.Stat. Ann. §§ 1 *et seq.* In June of 1989, he was found to be totally disabled within the meaning of that Act, and his benefits were adjusted accordingly.

Just prior to this, on May 1, 1989, Felton filed a complaint in the United States District Court for the Eastern District of Pennsylvania, to recover damages from SEPTA under FELA for the injuries which he sustained in the June 16, 1987, accident.

The district court granted summary judgment in favor of SEPTA on January 31, 1990, on the ground that its City Transit Division employees were not protected by FELA because that division was not a "common carrier by railroad" engaging in interstate commerce.[2] The court granted Felton's motion for reconsideration on April 11, 1990, and at the same time granted leave for supplemental discovery. However, on February 19, 1991, the district court again granted summary judgment in favor of SEPTA, concluding that Felton's employment with SEPTA was limited to the City Transit Division and reaffirming its earlier holding that this division was not subject to FELA. *Felton,* 757 F.Supp. at 626 n. 2.

## II.

Felton has failed to prevail on two issues in seeking to present a claim under FELA against SEPTA. First, he has not pointed to statutory support for his contention that an intrastate division of a transit authority such as SEPTA is, within the meaning of FELA, "engaging in commerce between [the states]." We find that Congress did not intend to extend FELA to employees of an intrastate transportation entity such as the CTD, even though it is organizationally affiliated with an interstate carrier, which is subject to FELA, such as SEPTA's Regional Rail Division. The statutory scheme governing regional rail services, including the Northeast Rail Services Act of 1981 ("NERSA"), the Rail Passenger Service Act of 1970, 45 U.S.C. §§ 501–658, as amended, ("RPSA") and the Federal Railroad Safety Act, 45 U.S.C. § 421 *et seq.* (1986) ("RSA"), reveals that Congress sought to preserve the distinction between interstate and intrastate carriers even while it was dissolving the Consolidated Rail Corporation ("Conrail") and thereby delegating certain interstate functions to local transit authorities like SEPTA.

Felton also has failed to prevail on a second issue: he has fallen short of demonstrating that the City Transit and Regional Rail Divisions are so physically integrated that the two divisions may, for practical purposes, be viewed as a single common carrier "engaging in commerce between any of the several states." An analysis of the operational relationship between the CTD and the Regional Rail Division illustrates that the two divisions, contrary to Felton's protestations, are more separate than integrated. Thus, we are left with the conclusion that SEPTA renders predominately intrastate service, in spite of the fact that one of its divisions—the Regional Rail Division—provides interstate transportation.[3] As the district court aptly put it, the "interstate" functions of SEPTA are "de minimis" and therefore do not warrant

**2.** FELA, 45 U.S.C. § 51, provides in pertinent part:

> Every common carrier by railroad while engaging in commerce between any of the several states ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury ... resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves or other equipment.

> Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, ... be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter.

**3.** The definition of "commuter service" contemplates "short-haul rail passenger service operated in metropolitan and suburban areas, whether within or across the geographical boundaries of a state...." 45 U.S.C. § 502(9).

subjecting the entire authority to FELA coverage. 757 F.Supp. at 631–632. Each of these points is elaborated below.

## A.

■ Persons seeking to recover damages under FELA must establish four points. First, they must establish that the defendant is a common carrier by railroad engaged in interstate commerce; second, they must prove that they were employed by the defendant and assigned to perform duties which furthered such commerce; third, they must demonstrate that their injuries were sustained while they were employed by the common carrier; and finally, they must prove that their injuries resulted from the defendant's negligence. *See* footnote 2, *supra; see also Fowler v. Seaboard Coastline RR. Co.,* 638 F.2d 17 (5th Cir. Unit B).

As the district court noted, the "threshold issue" raised by SEPTA's motion for summary judgment is whether, at the time his injury occurred, Felton was employed by a "common carrier by railroad" engaged in interstate commerce. *Felton,* 757 F.Supp. at 627. On this pivotal issue, the district court concluded first, and Felton conceded, "that urban rapid transit systems, often referred to as subways or street railways, are not common carriers by railroad for purposes of the FELA." *Felton,* 757 F.Supp. at 627.[4] This conclusion is buttressed, *inter alia,* by prior case law such as *Ferguson v. Philadelphia Transp. Co.,* 205 F.2d 520 (3d Cir.), *cert. denied,* 346 U.S. 867, 74 S.Ct. 107, 98 L.Ed. 377 (1953). In *Ferguson,* this court concluded that the Philadelphia Transportation Company ("PTC"), the predecessor of the City Transit Division, was a street railway which did not fall within the coverage of FELA, even though 1.3 miles of the defendant's tracks were situated outside of the Commonwealth of Pennsylvania and therefore contributed in some fashion to interstate commerce. 205 F.2d at 520. This court therefore affirmed the decision of the district court which had held that the PTC was not a common carrier since it operated a "system of street railway and bus lines in the City of Philadelphia." *Ferguson v. Philadelphia Transp. Co.,* 113 F.Supp. 275, 275–76 (E.D.Pa.1952), *aff'd,* 205 F.2d 520 (3d Cir.1953).

■ Nevertheless, Felton insists that as an employee of the City Transit Division of SEPTA he may assert rights arising under FELA because SEPTA also operates an interstate carrier, the Regional Rail Division, whose employees, no one disputes for the purposes of this litigation, are covered by FELA. *Felton,* 757 F.Supp. at 627 n. 4. Thus, he argues in effect that because one division of SEPTA is subject to FELA, so then at least is one other, the City Transit Division. As we view the relevant statutes, however, we reach a contrary conclusion.

To adopt Felton's reasoning would result in an unwarranted judicial expansion of FELA, because a review of legislation affecting commuter railroad transportation over the past decade reveals a consistent congressional intent to distinguish between intraurban rail transportation and interstate railroads. The passage of the Northeast Rail Services Act of 1981 ("NERSA"), for example, reflected Congress' desire to differentiate between purely urban systems of transportation and interstate railroads. NERSA mandated the withdrawal of Conrail from regional and interstate commuter rail service by January 1, 1983, and Conrail's commuter rail properties were transferred to local transit authorities. *See* § 45 U.S.C. §§ 744a, 1102(2) (1987). In NERSA, Congress identified SEPTA as one of several "commuter authorities" permitted to acquire Conrail's commuter rail operations, and on January 1, 1983, SEPTA did so and commenced operation of its Regional Rail Division. (R.

---

**4.** *Citing Mangum v. Capital Traction Co.,* 59 App.D.C. 241, 39 F.2d 286, 287 (D.C.Cir.1930) (District of Columbia transit company did not become a common carrier under FELA, simply because one of its lines extended into a Mary- land community). *See also Chicago Transit Authority v. Flohr,* 570 F.2d 1305 (7th Cir.1977) (urban rapid transit systems do not constitute a "railroad").

192a). *See* 45 U.S.C. § 1104. *See also* 45 U.S.C. §§ 584, 586, 745.

However, the dissolution of Conrail pursuant to NERSA was not accompanied by an expansion of the scope of FELA. Instead, with the passage of NERSA, Congress amended the Rail Passenger Service Act of 1970 ("RPSA"), 45 U.S.C. §§ 501–658 and these amendments provided that even though regional and local commuter authorities were to acquire Conrail's commuter lines, every form of rail transportation, including urban subway lines, was not to be subsumed under the federal regulatory network. Quite the contrary, § 591 of RPSA explicitly states that it was preserving the regulatory status quo:

> [a]ny commuter authority operating *commuter service* under this subchapter shall be subject to applicable laws *with respect to such service,* including but not limited to the Railway Labor Act ... the Railroad Retirement Act of 1974....

45 U.S.C. § 591 (1987) (emphasis added and citations omitted). As the district court correctly noted, § 591 preserves the distinction between commuter service and transit service:

> [u]nder § 591, commuter authorities such as SEPTA which assumed operation of regional lines became subject to all laws, including the FELA, previously applicable to Conrail. Such "applicable laws," however, govern commuter authorities only with regard to their *commuter services.* Section 591 ... does not subject to federal regulations non-commuter services such as those within SEPTA's City Transit Division.

757 F.Supp. at 628 (emphasis in original).

The district court notes in footnote 5 that RPSA at 45 U.S.C. § 502 (inadvertently § 702 in the footnote), defines "commuter service" to include "regional 'rail passenger service ... whether within or across the geographical boundaries of a State....' 45 U.S.C. § 702 (sic). By contrast, the term 'transit service' generally refers exclusively to the subway or street railway operations within a single urban community." *Id.* at 628 (*citing Omaha v. Council Bluffs Street Railway Co. v. Interstate Commerce Commission,* 230 U.S. 324, 33 S.Ct. 890, 57 L.Ed. 1501 (1913)). Accordingly, under § 591, if FELA is deemed an "applicable law," then it attaches only to the *interstate* functions of a commuter service (such as SEPTA's Regional Rail Division)—it therefore has no impact on a "transit service" like the CTD.

The Federal Railroad Safety Act, 45 U.S.C. § 421 *et seq.* (1986) ("RSA"), provides further evidence of congressional desire to maintain the distinction between interstate railroads and intraurban transit systems. For example, under RSA amendments, the Secretary of Transportation was granted the power to promulgate rules in order to regulate "all areas of railroad safety", namely,

> the safety of commuter or other short-haul rail passenger service in a metropolitan or suburban area, including any commuter rail service which was operated by the Consolidated Rail Corporation as of January 1, 1979.

45 U.S.C. § 431(k) (1986).

In a 1988 amendment to RSA, the term "railroad" was defined to exclude "rapid transit operations within an urban area that are not connected to the general railroad system of transportation." 45 U.S.C. § 431(e) (Supp.1991). Thus, in addition to the fact that in enacting NERSA Congress did not state that urban subway workers would henceforth be covered by FELA, to infer such coverage in light of RSA would be to overlook Congress' studied efforts to restrict the application of its laws to commuter services providing interstate or at least in the case of RSA, "commuter" transportation.

Indeed, in discussing the 1982 amendments to RSA, the House Committee on Energy and Commerce stated that the Federal Railroad Safety Act of 1970 was the federal government's "primary statutory framework" for "monitoring the safety of railroad operations." H.R.Rept. No. 97–571, Part 1, 97th Cong.2d sess., reported in 1982 U.S.Cong. & Ad.News at 4480, 4495. The 1982 amendments to RSA, entitled the "Rail Safety and Service Improvement Act of 1982", emphasized that "this amendment

does *not* extend FRSA [Federal Railroad Safety Act] jurisdiction to rail rapid transit operations *such as subways* or *trolley lines.*" *Id.* at 4524 (emphasis added). The Committee noted that the extent of federal jurisdiction

> includes service operated by a common carrier by railroad or a successor operator (such as a commuter agency), but *excludes* rail service operated by street railways or rail rapid transit systems *unless* they are operated as a part of, or over the lines of, the general system of rail transportation.

*Id.* (emphasis added). The Committee then indicated that commuter services which had been operated by Conrail (such as SEPTA's Regional Rail Division) are "considered as a part of the general system of rail transportation." *Id.*[5] Thus, for the purposes of § 431(e), it is the Regional Rail Division, and not the City Transit Division, which is "connected to the general railroad system of transportation."

### B.

▮▮▮ Although the passage of NERSA obligated local transit authorities to assume responsibility over regional commuter services, that act also evinces a clear congressional intent to preserve the rights of interstate workers whose erstwhile employer had been Conrail. Specific provisions of NERSA apply only to former Conrail employees who had been hired by SEPTA in order to operate its commuter rail lines. There is nothing in NERSA which states, or even implies, that the act alters the status of employees who had never been engaged in interstate commerce. As noted at page 64, *supra*, this conclusion is consistent with the amendment to RSA which excluded from the term "railroad" urban transit systems which were not connected to the "general railroad system of transportation." 45 U.S.C. § 431(e) (Supp. 1991).

Felton insists, however, that the two divisions are, in fact, a single entity. Three points should be noted with regard to his "integration" theory. First, although the City Transit Division is managed by the same organization which runs the Regional Rail Division, it is not physically integrated with the Regional Rail Division. Second, the workers in each division are subject to different employment benefit schemes and the two divisions' labor markets are not integrated, and finally, the 1985 report on regional rail lines cited by Felton does not support the proposition that SEPTA as a whole constitutes a common carrier.

There is a notable lack of physical integration between the CTD and the Regional Rail Division. The CTD and the Regional Rail Division use separate and incompatible physical facilities and equipment. For example, SEPTA's Market Street–Frankford subway cars cannot be operated on the regional rail tracks because they use a completely different power source than do the regional rail cars. (R. 97a–99a). The CTD's cars operate on 600 volt electrical power provided by a third rail, while the Regional Rail Division's cars operate on an overhead 12,000 volt supply. (R. 61a, 191a). Although the wheel gauge of many of the CTD subway cars matches that of the Regional Rail Division cars, the equipment used by the two divisions is not interchangeable.

Nor can we glean from the record any evidence which indicates that cars are transferred between the Regional Rail and City Transit Lines via the single access track at the Fern Rock yard. Even the most generous acceptance of Felton's view of the functions of, and activities at, the Fern Rock yard would not so distinguish

---

5. Felton's reliance on *United States v. Massachusetts Bay Transp. Auth.,* 360 F.Supp. 698 (D.Mass.1973) is misplaced for two reasons. First, the court did not hold that the Massachusetts Bay Transportation Authority is a "railroad" within the meaning of FELA. Rather, it held that the Transportation Authority could be considered "rail transportation" within the jurisdiction of the Federal Railroad Administration. Second, although the court's cursory reading of RSA's legislative history led it to conclude that that act governs "all those means of rail transportation as are commonly included within the term," 360 F.Supp. at 699, it is clear from the 1983 and 1988 amendments to RSA that urban transit systems are excluded from the statute's purview. *See* 45 U.S.C. § 431(k) (1986); 45 U.S.C. § 431(e).

this case from *Ferguson, supra,* as to exclude it from the holding in *Ferguson,* that a minimal connection between an interstate and intrastate line does not render a street railway a common carrier by rail under FELA.

In view of this lack of a physical connection between the CTD and the Regional Rail Division, Felton's reliance on *Lone Star Steel Co. v. McGee,* 380 F.2d 640 (5th Cir.), *cert. denied,* 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967), is inapposite. In *Lone Star,* the Court concluded that a plant railroad was subject to FELA and the Federal Safety Appliances Act. Lone Star, a steel manufacturer, had within its plant a network of tracks which were connected to an interstate track operated by a common carrier. The common carrier's track extended into the Lone Star plant, where Lone Star's railroad cars were transferred onto the common carrier's line. The court concluded that "the two [companies] are highly integrated and mutually dependent," 380 F.2d at 648, and held that FELA covered the intraplant transportation service because the intraplant operation was a "necessary part" of the common carrier's operation and because Lone Star admitted that it was "virtually the sole stockholder" of the common carrier. *Id.* at 643. As noted above, SEPTA's structure is easily distinguishable, as the CTD and Regional Rail Division do not share a physical nexus nor, in spite of some scheduling coordination, are they in any sense mutually dependent operations.

As the district court correctly noted, Felton relies on cases which do not consider the impact of NERSA on the operation of local transit authorities. Consequently, these cases "do not come to terms with the fact that Congress could have but did not extend FELA coverage to local transit workers not previously employed by Conrail." *Felton,* 757 F.Supp. at 630. Moreover, we believe that Felton has fallen short in his evidentiary burden, even under the most liberal application of the "integration" theory.

The separation between the City Transit and Regional Rail Divisions also is evidenced by the fact that the employees of the two divisions are not subject to common terms and conditions of employment. For example, since 1968, City Transit employees have been covered by the Pennsylvania Workers' Compensation Act, 77 Pa. Stat.Ann. §§ 1, *et seq.* (1954). Regional Rail employees, on the other hand, have been covered by FELA ever since SEPTA became their employer in 1983. (R. at 446a–450a). In addition, NERSA regulated the transfer of Conrail employees to local transit authorities by ensuring that the former Conrail employees maintained their level of benefits. *See* 45 U.S.C. § 797. *See also* 45 U.S.C. §§ 588, 590. These provisions set forth the employment rights of employees of the newly created Regional Rail Division and emphasized that employees in the other three divisions were not affected by NERSA. For example, Regional Rail Division employees continue to contribute to the Railroad Retirement fund as they did when they were employed by Conrail. (R. 191a). Accordingly, they do not contribute to the social security fund, whereas employees of SEPTA's other three divisions are subject to the social security tax and they do not contribute to the Railroad Retirement fund. *Id.*

Moreover, an examination of interdivision employee mobility reveals that employees may not freely move between SEPTA's four divisions. Felton offers no evidence to counter SEPTA's assertion that "there is no interchange of employees at Mr. Felton's level among the divisions." Appellee Br. at 5 (*citing* R. 61a, 191a). Indeed, when an hourly employee such as Felton seeks to transfer from one division to another, that employee must first resign his/her position and then reapply to the new division. And the seniority provisions of the Transportation and Maintenance Units are restricted to employees of the property "formerly owned by the Philadelphia Transportation Company," i.e., the CTD, and these provisions have no impact on the employees of the Regional Rail Division. (R. 399a). Each division has its own union and each division has its own wage scale and system of seniority. (R. 61a, 191a, 399a). Thus, other than sharing the same

upper management and a coordination of schedules, there is virtually no evidence that the two divisions are "integrated."

Finally, we find little in the way of support for Felton's position in the 1985 *Report on Regional High Speed Lines* which was authored by Robert Thompson and William Coleman, Jr. Although the report does speak of an integrated "general railroad system of transportation," we find little probative force in a prospective policy paper such as this, especially in view of the fact that it focused solely on the Regional Rail Division. Indeed, this report refers to an "integrated" SEPTA solely from the standpoint of improving the system in effect at the time of the report and from the standpoint of the consumer of transportation. It offers no elucidation on the much narrower question at issue in this case. Interestingly, the report suggests that, for morale purposes, the two divisions should retain their separate identities by allowing Regional Rail workers to change their uniforms so as to resemble their former work clothes and to change the division name from the "Regional High Speed Line" to the "Regional High Speed *Rail* System." *See* 1985 Thompson/Coleman Report (R. 312a) (emphasis added).

### III.

Because we find that Congress did not intend to extend FELA coverage to employees of urban subways and because the City Transit Division of SEPTA is not operationally connected to or integrated with, the Regional Rail Division, we will affirm the order of the district court.