**Sean GREENE, Plaintiff,**

v.

**LONG ISLAND RAILROAD COMPANY, Barbara A. Arias, Thelma Schulman and Metropolitan Transportation Authority, Defendants.**

No. CV 98–4316.

United States District Court,
E.D. New York.

June 2, 2000.

Elkind, Flynn & Maurer, P.C., by Michael Flynn, Garden City, NY, for Plaintiff.

Hoguet Newman & Regal, LLP, by Melissa L. Weiss, Brian C. Dunning, Fredric S. Newman, NY, for Defendants.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

This is a case brought pursuant to, *inter alia*, the Federal Employers Liability Act, 45 U.S.C. § 51 ("FELA"). Plaintiff Sean Greene ("Plaintiff") is a police officer who, at the time of his alleged injury, was employed by the Metropolitan Transit Authority ("MTA"). Plaintiff alleges that he suffered an on the job injury when he was a passenger in a Jeep used as a surveillance vehicle to patrol a Long Island Railroad ("LIRR") station.

Presently before the court is the motion of defendants MTA and LIRR for summary judgment. MTA that argues it cannot be liable under FELA because it is not a common carrier within the meaning of the statute. While the LIRR concedes that it is a common carrier, it seeks summary judgment on the ground that it was neither Plaintiff's employer nor was Plaintiff a "borrowed servant" of the LIRR at the time of the injury.

As discussed below, the court holds, reluctantly, that the MTA is a common carrier and, consequently, that Plaintiff may seek recovery pursuant to FELA for his on the job injury. The court's reluctance comes not from any sense that the common carrier question is close. It arises, instead, from the court's conviction that FELA's liability standard regarding railroad workers injured on the job is one that has become outmoded.

In a time when other workers, including those involved in far more hazardous situations, are covered by a comprehensive scheme of workers' compensation benefits, it is archaic and unwarranted for railroad workers to be entitled to a different standard that takes them outside of the realm of the typical employee. Municipal police officers and firefighters are engaged in professions that daily subject them to situations far more dangerous than that of the typical railroad worker. Yet, if these individuals, who put their lives at peril every day, are injured on the job, they are covered by workers compensation benefits.

Each and every railroad worker, on the other hand, from the ticket taker to the administrative office worker, may collect damages under FELA, for an on the job injury. In such cases, the railroad employee is entitled to recover by showing that their injury is attributable to the negligence, however slight, of their employer. *See Williams v. Long Island Railroad Co.*, 196 F.3d 402, 406–07 (2d Cir.1999).

While a statutory scheme aimed at protecting railroad workers from the "physical dangers of railroading" may have been necessary in 1908, when FELA was passed, that is no longer the case. In the absence of a change in the statute, however, this court is powerless to carve out exceptions to the Supreme Court's broad and longstanding definition of what constitutes a common carrier subject to FELA—a definition that, in this court's view, clearly encompasses the interstate operations of the MTA.

## BACKGROUND

### I. The Parties and the Accident

As noted above, Plaintiff was, at the time of his injury, a police officer employed by the MTA. The MTA is a public benefit corporation created pursuant to the Public Authorities Law of the Sate of New York. *See* N.Y. Pub. Auth. L. § 1264. The LIRR, which also exists pursuant to the New York State Public Authorities Law, is one of the wholly owned commuter railroad subsidiaries of the MTA.

Prior to 1997, the LIRR maintained its own police force. Beginning in 1997, New York law empowered the MTA to provide and maintain an MTA police force. LIRR police officers like Plaintiff, were, beginning in 1998, appointed to the newly established MTA police force. Thus, as of March 4, 1998, at the time of the accident forming the basis of Plaintiff's complaint, Plaintiff became an employee of the MTA and was no longer employed by the LIRR.

At the time of the accident Plaintiff was riding with his partner, police officer Wyckoff, in an unmarked Jeep used for surveillance purposes by MTA police officers assigned to the LIRR. Wyckoff and Plaintiff were responding to a call regarding auto theft at the Ronkonkoma, New York LIRR station. En route, the Jeep collided with a car driven by defendant Barbara Arias and owned by defendant Thelma Schulman. Plaintiff seeks damages as compensation for the injuries allegedly suffered as a result of this accident.

II. *Plaintiff's Complaint and Defendants' Motion*

Plaintiff's theory of recovery supporting federal jurisdiction is a claim brought pursuant to FELA. All other claims sound in common law negligence.

Defendants MTA and LIRR seek summary judgment on the FELA cause of action. MTA claims that it is not a proper defendant under FELA because it is not a common carrier within the meaning of the statute. LIRR, while conceding that its employees are subject to FELA, argues that it is not a proper defendant here because it was not Plaintiff's employer at the time of the accident and Plaintiff was not a "borrowed servant" sufficient to invoke FELA. The court considers the merits of the motion below.

### DISCUSSION

I. *Legal Principles*

 The Federal Employers' Liability Act imposes liability upon common carriers by railroad for the injury or death of railroad employees that results, in whole or in part, from the railroad's negligence or that of its employees. 45 U.S.C. § 51. *See Edwards v. Pacific Fruit Express Co.,* 390 U.S. 538, 538, 88 S.Ct. 1239, 20 L.Ed.2d 112 (1968). FELA was enacted early in the last century to protect railroad employees from the physical dangers of railroading. Thus, the statute has been described as a "federal remedy" that shifts part of the "human overhead" costs from employees to employers. *Consolidated Rail Corporation v. Gottshall,* 512 U.S. 532, 542, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994). As stated by Justice Douglas in 1949, the FELA was enacted to "put on the railroad industry some of the cost for the legs, eyes, arms, and lives which it consumed in its operations." *Wilkerson v. McCarthy,* 336 U.S. 53, 68, 69 S.Ct. 413, 93 L.Ed. 497 (1949) (Douglas, J., concurring).

 By its express terms, FELA applies only to "common carriers." *See* 45 U.S.C. § 51; *Chaneyfield v. City of New York,* 525 F.2d 1333, 1336 (2d Cir.1975). The Supreme Court has construed this term simply, to mean "one who operates a railroad as a means of carrying for the public ...." *Pacific Express,* 390 U.S. at 540, 88 S.Ct. 1239, quoting, *Wells Fargo & Co. v. Taylor,* 254 U.S. 175, 187–88, 41 S.Ct. 93, 65 L.Ed. 205 (1920); *see also Lone Star Steel Company v. McGee,* 380 F.2d 640, 643 (5th Cir.1967) ("common carrier ... holds himself out to the public as engaged in the business of transportation of person or property from place to place for compensation, offering his services to the public generally"), quoting, *Kelly v. General Elec. Co.,* 110 F.Supp. 4, 6 (E.D.Pa.), *aff'd,* 204 F.2d 692 (3d Cir.1953).

Where common carrier status is not found, it is generally because the business in which the entity is engaged is something other than the business of offering to transport goods or passengers by rail. For example, in *Wells Fargo & Co. v. Taylor,* 254 U.S. 175, 41 S.Ct. 93, 65 L.Ed. 205 (1920), the Supreme Court held that the defendant express messenger service company was not a common carrier. Thus, although the plaintiff-employee was riding in an express car provided by the railroad at the time of his injury, the company employing plaintiff was not in the business of providing rail service as a means of carrying for the public and was therefore not a common carrier within the meaning of FELA. *Wells Fargo,* 254 U.S. at 187–88, 41 S.Ct. 93; *see also Robinson v. Baltimore & Ohio R. Co.,* 237 U.S. 84, 94, 35 S.Ct. 491, 59 L.Ed. 849 (1915) (Pullman car porter was neither a railroad employee nor an employee of a common carrier).

Similarly, in *Edwards v. Pacific Fruit Express Co.,* 390 U.S. 538, 88 S.Ct. 1239, 20 L.Ed.2d 112 (1968), the Supreme Court held that an employee of a company that owned and leased refrigerated cars to railroads was not covered by FELA. There, despite the fact that the plaintiff was injured while on a railroad, he was not cov-

ered by FELA because his employer was not engaged in the business of offering to carry goods or passengers by rail and was, therefore, not a common carrier. *Edwards,* 390 U.S. at 543, 88 S.Ct. 1239.

■ In *Edwards,* the Supreme Court stressed that an entity is subject to FELA only if it operates a going railroad and FELA was never intended to cover those whose "activities and facilities which, while used in conjunction with railroads and closely related to railroading, are yet not railroading itself." *Edwards,* 390 U.S. at 540, 88 S.Ct. 1239.[1]

■ When determining whether a defendant is a common carrier, it is not the corporate form of the entity that is dispositive. Instead, courts look to the actual operations of the entity to determine whether it is operating as a common carrier. *See United States v. State of California,* 297 U.S. 175, 181–82, 56 S.Ct. 421, 80 L.Ed. 567 (1936) (common carrier status under the Safety Appliance Act depends not upon "corporate character or declared purposes, but upon what it does"), quoting, *United States v. Brooklyn Eastern Dist. Term.,* 249 U.S. 296, 304, 39 S.Ct. 283, 63 L.Ed. 613 (1919) (holding that freight terminal was a common carrier for purposes of the Hours of Service Act).

With these principles in mind, the court turns to consider whether the MTA is a common carrier by railroad that is subject to FELA.

II. *The Purpose, Structure and Functioning of the MTA*

A. *Purpose of the MTA*

As noted above, the MTA is a public benefit corporation created pursuant to the Public Authorities Law of the State of New York. *See* N.Y. Pub. Auth. L. § 1264. MTA refers to itself as the "largest public transportation provider in the Western

Hemisphere." CFO's Letter of Transmittal dated March 27, 1997, Comprehensive Annual Financial Report of MTA for year ended December 31, 1997, annexed as Exhibit B to Declaration of Melissa L. Weiss in Support of Motion for Summary Judgment (hereinafter "Weiss Decl.").

The legislation pursuant to which the MTA was created charges it with the "continuance, further development and improvement of commuter transportation and other services related thereto within the metropolitan commuter district." N.Y. Pub. Auth. L. § 1264(1). To these ends, the MTA has broad powers including the power to:

- acquire transportation facilities;
- "establish, construct, effectuate, operate, maintain, renovate, improve, extend or repair" any facility acquired;
- establish and collect fares and tolls;
- establish standards of operation and rules and regulations regarding the conduct and safety of the public;
- lease railroad cars for use in passenger service and,
- "do all things it deems necessary, convenient or desirable to manage, control and direct the maintenance and operation of transportation facilities, equipment or real property operated by or under contract, lease or other arrangement" with MTA.

N.Y. Pub. Auth. L. § 1266(1)-(8).

B. *MTA's Management and Structure*

The MTA is governed by a board whose members are chosen by the Governor of the State of New York, the Mayor of New York City and executives of the counties served by the MTA. Common directors serve on the Boards of Directors for both the MTA and the LIRR.

---

1. In addition to common carrier status, a defendant must be engaged in interstate commerce to be subject to FELA. Thus, companies operating traditional local street railways are not within the scope of FELA. *See Washington Ry. & Elec. Co. v. Scala,* 244 U.S. 630, 637–38, 37 S.Ct. 654, 61 L.Ed. 1360 (1917).

The MTA is comprised of "subsidiary units" and "component units." The LIRR is of the MTA's "subsidiary units." Aside from the LIRR the wholly owned "subsidiary unit" of the MTA that provides transportation services is the Metro–North Commuter Railroad Company ("Metro–North"). Metro–North provides passenger transportation between New York City and the New York State communities of Westchester, Dutchess, Putnam, Orange and Rockland counties and between New York City and Connecticut communities in New Haven and Fairfield. Together, the LIRR and Metro–North are referred to as MTA's "commuter rails."

The MTA Excess Loss Trust Fund which provides coverage against losses from catastrophic events and provides budget stability to MTA participants is also a subsidiary unit of the MTA, along with MTA headquarters which provides support in budget, legal, real estate and other areas to the MTA component units.

The MTA "component units" that provide transportation services are:

- the New York City Transit Authority and its blended component unit, Manhattan and Bronx Surface Transit Operating Authority which provide subway and bus service in four New York City boroughs;
- the Staten Island Rapid Transit Operating Authority which provides passenger service within Staten Island, and
- the Metropolitan Suburban Bus Authority which provides bus service in New York City and Nassau County.

Also included as component parts of the MTA are the Triborough Bridge and Tunnel Authority which operates toll bridges and tunnels as well as a parking garage and the New York Coliseum.

The MTA commuter rails are the segments of the MTA that are involved in interstate operations. Workers employed by these commuter rails are covered under FELA, while those employed by MTA's intrastate component units (such as New York City Transit workers) are covered by workers' compensation. Prior to creation of the MTA police force, approximately 11,000 of the 64,000 individuals employed by the MTA and its subsidiary and component units were employed by the commuter rails.

MTA apparently attaches significance to denominating its commuter rails as subsidiary units, rather than component units. It refers to the component units as "operationally and legally independent" of MTA headquarters while making no such similar distinction with respect to the commuter rails.

### C. MTA's Functions

When describing its functions, the MTA states that it "coordinates the planning and overall policies of its agencies, approves operating and capital budgets and performance plans, and monitors financial and operating activities of its agencies." The MTA also states that it "is responsible for certain cross agency support functions." The MTA characterizes its subsidiary agencies, including its commuter rails as "serv[ing] the public by operating the transportation facilities." Letter dated December 17, 1997 from MTA to General Counsel, U.S. Railroad Retirement Board, Weiss Decl., Exhibit D.

While the MTA's component units are certainly responsible for providing transportation services, the MTA itself is intimately involved in the management, not only of its subsidiaries' finances, but of their real estate and other assets. Thus, the MTA states that the "careful management" of its real estate assets has included a leaseback transaction for the LIRR Hillside maintenance facility, where LIRR trains are repaired and maintained, which transaction produced approximately $22 million in capital funds for the MTA. Funds so obtained, along with other MTA funds are used, *inter alia*, for repairing and upgrading railroad infrastructure, building new facilities and buying new equipment.

The MTA has significant involvement in the marketing of the transportation services available through its subsidiary and component units. The MTA website refers to all transportation facilities (including the LIRR) as part of the "network" of MTA services. Riders are referred to as "MTA customers." Among other things, the MTA takes credit for "offer[ing] the region efficient, environmentally sound travel alternatives."

### III. *The MTA Operates a Common Carrier*

■ The court has considered the facts set forth in the parties' submissions as well as arguments made during a recent oral argument held in this case. It is worth noting that no case has been presented to the court that is directly on point, and it appears that none exists. The many decisions relied upon by the parties, as detailed above, focus on the issue of whether the defendant is engaged in the business of offering transportation services to the public at large. Where the offer to transport is made to all, common carrier status exists.

Here, there is no question but that the facilities of the MTA and the LIRR are offered to the public at large, and therefore constitute common carriers. The issue in this case, however, is not whether the facilities have common carrier status, but whether those facilities are "operated" by the MTA in a manner sufficient to confer common carrier status within the meaning of the FELA. This precise issue has not heretofore been decided and existing precedent is, accordingly, not helpful.

Seeking to escape the conclusion that it operates the LIRR, the MTA relies upon its own statement that it is the component and subsidiary units that actually "operate" the transportation facilities while the MTA does not. While the MTA concedes certain management responsibilities, it denies any responsibilities that can be described as "operating" its facilities. Such "operation" duties are, according to the

MTA, in the exclusive province of its subsidiary and component units.

The plain meaning of the word "operate," however, cannot be parsed as MTA suggests. Put simply, to operate, is noting more than to "perform a function." Black's Law Dictionary 984 (5th ed.1979); *see also* The Random House College Dictionary of the English Language 931 (rev'd ed.1982). While it is certainly true that the LIRR operates a common carrier, it is also true that MTA's extensive involvement in this entity leads to the conclusion that it, too, operates this common carrier.

■ There is nothing in either FELA or any court case construing the statute that limits the definition of the term "operate" to anything less that its usual broad meaning, *i.e.*, to "function." While the MTA characterizes its input as no more than policy-making and financial management, the papers before the court, including those demonstrating MTA's extensive involvement in the long range planning, marketing, and the day to day management of its commuter rails, convinces this court that MTA operates a common carrier within the meaning of FELA. As stated by the MTA itself, "[w]ithout the MTA, the two-state, 14 county, 4,000 square-mile territory it serves would grind to a halt." Weiss Decl. Exhibit B at 52.

In view of the foregoing, the court holds that MTA employees such as Plaintiff, assigned to work on the LIRR, are employed by an entity operating a common carrier engaged in interstate commerce. Plaintiff is no less employed by a common carrier today than when he performed the same duties when employed by the LIRR. Accordingly, Plaintiff may proceed pursuant to FELA.

The court is cognizant of state court opinions, relied upon by defendants, stating that the functions of the MTA "do not include the operation, maintenance and control of any facility." *Noonan v. Long Island Railroad,* 158 A.D.2d 392, 393, 551 N.Y.S.2d 232, 233 (1st Dep't 1990). quot-

ing, *Cusick v. Lutheran Medical Center,* 105 A.D.2d 681, 681, 481 N.Y.S.2d 122, 123 (2d Dep't 1984). Those opinions, however, arose in the context of negligence lawsuits where it was held that the proper responsible party was the local transportation provider and not the MTA. These cases did not decide the question of whether the MTA is a common carrier under the FELA definition and are therefore neither binding nor persuasive.

The court cautions that its holding here is limited to those employees of MTA who are engaged in the interstate common carrier operations of its commuter rails. Specifically, the holding that MTA operates a common carrier does not lead to the conclusion that all MTA employees, including those employed strictly in the MTA's intrastate operations (such as employees of the New York City Transit Authority), are to be covered by FELA.

Thus, employees of the MTA's component parts, including those entities that provide local transportation services and those that operate parking garages, bridges and tunnels are not, by this decision, covered by FELA. The mere interconnectedness of these entities through the MTA does not transform those entities into common carriers engaged in interstate commerce. *Accord Felton v. Southeastern Pennsylvania Transportation Auth.,* 952 F.2d 59, 62, 66 (3d Cir.1991) (refusing to apply FELA to employees engaged in purely intrastate operations, even though the entity for which the employee works is related to a transportation authority (like the MTA) that also oversees the operation of an interstate railway—any decision to the contrary would be an "unwarranted judicial expansion of FELA").

The court's unwillingness to judicially expand or contract the reach of FELA stems from the conviction that such action lies within the exclusive province of the legislature. While the court is of the opinion that the liability standard imposed by FELA in 1908 is an anachronism that has long outlived its usefulness, it is bound to apply the statute as enacted. Unless and until Congress acts to amend FELA to narrow its reach, the court must apply the statute as written by Congress and interpreted by the Supreme Court. Neither the plain language of the statute nor any interpretation thereof supports the narrow interpretation urged by the MTA. Under these circumstances, the court is constrained to hold that MTA operates a common carrier and accordingly interprets FELA to include MTA employees who, like plaintiff, are involved in the interstate operations of the MTA.

In view of the court's ruling that plaintiff, as an employee of the MTA, is covered by FELA, it is unnecessary to rule on the issue, argued in the alternative, that Plaintiff was a borrowed servant of the LIRR.

*CONCLUSION*

For the foregoing reasons, defendants' motion for summary judgment is denied.

SO ORDERED