OPINION OF THE COURT
Arthur M. Schack, J.
In this action, originally for negligence, and later amended to wrongful death, pursuant to the Federal Employers’ Liability Act (45 USC § 51 et seq. [FELA]), plaintiff alleges that defendants failed to provide decedent with a safe work environment and that defendants’ unsafe work environment caused decedent’s demise (motion, exhibit F, plaintiffs bill of particulars). Plaintiff claims, in the bill of particulars, that decedent, a retired employee of defendant Long Island Railroad (LIRR),
“was exposed to various toxic substances resulting in pulmonary disorders and liver cancer, including but not limited to asbestos, diesel fumes, burning and welding fumes, various dusts, cleaning solvents, de-greasing agents, aliphatic hydrocarbons, silicates, butyl acetone, tolune, acolated naptha, phoxyethylamine, trichloroethylene, perchloroethylene, carbon tetrachloride, mineral spirits, benzene, and herbicides on numerous occasions during the course of his employment from December, 1967 through May, 1984 [sic].”
Prior to working for defendant LIRR as a car repairman and welder, decedent performed related work for the Erie-Lackawana Railroad or its predecessors from April 1951 to November 1967 (motion, exhibit F, plaintiffs bill of particulars). Decedent, in his examination before trial (motion, exhibit N, at 59-60), admitted to smoking about one pack of cigarettes a day for 15 years. *746 Decedent was diagnosed with hepatitis C and cirrhosis of the liver in 1994, and was diagnosed with liver cancer in 1997. Mr. Pappalardo died on March 8, 2002 (motion, exhibit J, death certificate).
Defendants move to dismiss the Metropolitan Transportation Authority (MTA) as an improper defendant upon the grounds that the MTA is shielded from a FELA action pursuant to Public Authorities Law § 1266 (5) and for summary judgment and dismissal of the action on the grounds that there is no competent evidence that defendant LIRR failed to provide decedent with a reasonably safe work environment. Plaintiff, as executrix of decedent’s estate, cross-moves for partial summary judgment on the issue of liability, claiming that defendants’ failure to provide a safe work environment contributed to Mr. Pappalardo’s death.
For the reasons to follow, that branch of defendants’ motion to dismiss the MTA from the action, pursuant to Public Authorities Law § 1266 (5), is denied (counsel for LIRR and MTA continually refers to this subdivision of the Public Authorities Law as section 1266 [c], a subdivision which does not exist; the court will assume from the arguments of defendants’ counsel that counsel means section 1266 [5], and admonishes defendants’ counsel to prepare their motion papers correctly and proofread their papers before submission to this or any other court). For historical reasons, FELA applies to the LIRR, a railroad held to be in interstate commerce. FELA, as will be explained below, supercedes the MTA’s use of Public Authorities Law § 1266 (5) as a shield from lawsuits by injured Metro-North Railroad and LIRR employees. Therefore, defendant MTA, the owner and operator of defendant LIRR since 1966, will not be dismissed from the instant action.
That branch of defendants’ motion for summary judgment and dismissal of the instant action, as well as plaintiffs cross motion for partial summary judgment, is denied because triable issues of fact exist.
MTA is a Proper Defendant Pursuant to FELA
When still alive, decedent commenced the instant action for violation of FELA. Subsequently, decedent’s executrix amended the complaint to continue the case as a FELA wrongful death action. Plaintiff alleges that: decedent contracted occupational diseases and conditions as a result of his exposure to hazardous substances while an employee of the LIRR; the LIRR did not provide decedent with proper protective equipment, *747 warnings, and information as protection against these exposures; and defendants’ failure to consider and provide for the safety of its decedent employee was a violation of the statutory duties imposed by FELA. FELA provides at 45 USC § 51 that:
“Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, or between the District of Columbia and any of the States or Territories, or between the District of Columbia or any of the States or Territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.”
FELA was enacted in 1908, during the Progressive Era, to address the large number of work-related injuries in the railroad industry. In Kernan v American Dredging Co. (355 US 426, 431-432 [1958]), the Court stated that:
“[I]t came to be recognized that . . . the industrial employer had a special responsibility toward his workers, who were daily exposed to the risks of the business and who were largely helpless to provide adequately for their own safety. Therefore, as industry and commerce became sufficiently strong to bear the burden, the law, the reflection of an evolving public policy, came to favor compensation of employees and their dependents for the losses occasioned by the inevitable deaths and injuries of industrial employment, thus shifting to industry the ‘human overhead’ of doing business. For most industries this change has been embodied in Workmen’s Compensation Acts. In the railroad and shipping industries, however, the FELA and Jones Act provide the framework for determining liability for industrial accidents. But instead of a detailed statute codifying common-law principles, Congress saw fit to enact a statute of the most general terms, thus leaving in large measure to the courts the duty of *748 fashioning remedies for injured employees in a manner analogous to the development of tort remedies at common law. But it is clear that the general congressional intent was to provide liberal recovery for injured workers.” (See Atchison, T. & S. F. Ry. Co. v Buell, 480 US 557 [1987]; Rogers v Missouri Pacific R. Co., 352 US 500 [1957]; Urie v Thompson, 337 US 163 [1948].)
Justice William O. Douglas, in analyzing FELA, observed in his concurring opinion in Wilkerson v McCarthy (336 US 53, 68 [1949]) that:
“The Federal Employers’ Liability Act was designed to put on the railroad industry some of the cost for the legs, eyes, arms, and lives which it consumed in its operations . . . The purpose of the Act was to change that strict rule of liability, to lift from employees the ‘prodigious burden’ of personal injuries which that system had placed upon them, and to relieve men ‘who by the exigencies and necessities of life are bound to labor’ from the risks and hazards that could be avoided or lessened ‘by the exercise of proper care on the part of the employer in providing safe and proper machinery and equipment with which the employee does his work . . . [n]1 H. R. Rep. No. 1386, 60th Cong., 1st Sess. 2 (1908).”
FELA supercedes the common law and state laws, constitutional and statutory, relating to the liability of railroads for injury to employees in interstate commerce, and the FELA remedy is exclusive. (South Buffalo R. Co. v Ahern, 344 US 367 [1953]; Chicago, R. I. & P. R. Co. v Schendel, 270 US 611 [1926].) FELA cases tried in state courts use state procedural rules, but the substantive law is federal. (St. Louis Southwestern R. Co. v Dickerson, 470 US 409 [1985].) To recover pursuant to FELA, a plaintiff, as outlined in Fowler v Seaboard Coastline R.R. Co. (638 F2d 17, 19 [5th Cir 1981]), must prove
“(1) that defendants are common carriers by railroad engaged in interstate commerce; (2) that the injured was employed by the defendant with duties furthering such commerce; (3) that the injuries were sustained while claimant was so employed; and (4) that the injuries were the result of negligence of defendant company. 45 U.S.C. s 51.”
Defendants rely upon Noonan v Long Is. R.R. (158 AD2d 392 [1st Dept 1990]) to argue that defendant LIRR, a public benefit *749 corporation and. corporate subsidiary of defendant MTA, is shielded from the instant action by Public Authorities Law § 1266 (5). Public Authorities Law § 1266 (5) specifies that the MTA’s subsidiary corporations are distinct entities. Each is subject to suit and each is responsible for maintenance and repair of their own facilities, not the MTA. Further, Public Authorities Law § 1266 (5) states that “[t]he employees of any such subsidiary corporation, except those who are also employees of the [MTA], shall not be deemed employees of the [MTA].” In Noonan, plaintiff sued both the MTA and the LIRR for personal injury suffered by tripping over a raised railroad spike when crossing LIRR tracks. Noonan was clearly not a FELA action and the Court held (at 393) that “in this action which alleges negligence in the improper operation, maintenance and control of the railroad facilities owned by the LIRR, the MTA is not a proper party.”
Greene v Long Is. R.R. Co. (99 F Supp 2d 268 [US Dist Ct, ED NY 2000], affd 280 F3d 224 [2d Cir 2002], cert denied sub nom. Metropolitan Transp. Authority v Greene, 538 US 1031 [2003]) distinguished Noonan with respect to FELA actions against the MTA. In Greene, an MTA police officer was injured in a motor vehicle accident while responding to a possible auto theft at an LIRR station. The United States District Court (99 F Supp 2d at 272) observed that:
“When determining whether a defendant is a common carrier, it is not the corporate form of the entity that is dispositive. Instead, courts look to the actual operations of the entity to determine whether it is operating as a common carrier. See United States v California, 297 US 175, 181-82 . . . (1936).”
The court then analyzed whether the MTA, the LIRR’s owner and operator, is a common carrier subject to FELA. After analyzing the extensive involvement of the MTA with the LIRR, and looking at the plain meaning of the word “operate,” which means to “function,” the court concludes (at 274) that:
“While the MTA characterizes its input as no more than policy-making and financial management, the papers before the court, including those demonstrating MTA’s extensive involvement in the long range planning, marketing, and the day to day management of its commuter rails, convinces this court that MTA operates a common carrier within the meaning of FELA. As stated by the MTA itself, ‘[wjithout the MTA, the two-state, 14 county, 4,000 square- *750 mile territory it serves would grind to a halt.’ ”
The court (at 274-275) then distinguished Noonan, noting that Noonan and similar cases (at 275)
“arose in the context of negligence lawsuits where it was held that the proper responsible party was the local transportation provider and not the MTA. These cases did not decide the question of whether the MTA is a common carrier under the FELA definition and are therefore neither binding nor persuasive.”
Therefore, further (at 275), the court held that:
“Hits holding here is limited to those employees of MTA who are engaged in the interstate common carrier operations of its commuter rails. Specifically, the holding that MTA operates a common carrier does not lead to the conclusion that all MTA employees, including those employed strictly in the MTA’s intrastate operations (such as employees of the New York City Transit Authority), are to be covered by FELA.”
The MTA, in its appeal of Greene to the Second Circuit, claimed that it could not be a “common carrier” under FELA because it didn’t operate the LIRR, but was only involved with various marketing, financial and real estate management functions. The Second Circuit, in its decision (280 F3d at 236-239), reviewed the purpose and history of the MTA. The court held (at 236):
“In 1966 MTA acquired LIRR as a subsidiary. The board of directors of MTA is also the board of directors of LIRR, see [Public Authorities Law] § 1266(5), and the MTA chairman determines who will be president of LIRR. MTA is not, however, simply a holding company or a stockholder content to manage LIRR through overlapping formal corporate governance. Rather, the record reveals that MTA, using nonoverlapping personnel employed at its own headquarters (‘MTAHQ’), participates directly and extensively in, inter alia, the financial side of LIRR’s operations. MTA’s 1997 Annual Report, for example, states that ‘Metropolitan Transportation Authority Headquarters (“MTAHQ”) provides support in budget, cash management, finance, legal, real estate, treasury, risk management, and other areas, to . . . [t]he Long Island Rail Road Company (“LIRR”) *751 . . .’ (MTA 1997 Annual Report, Letter of Deputy Executive Director and Chief Financial Officer, at 50.)”
Using the deposition of Gary Dellaverson, then and now the MTA’s Director of Labor Relations (the lead management negotiator in the present unresolved contract negotiations between the New York City Transit Authority [TA], the MTA subsidiary responsible for New York City subways and buses, and Local 100 of the Transport Workers Union), the court concluded (at 237) that “MTA is directly involved in LIRR’s negotiations with labor unions.” Thus, the Second Circuit concluded (at 239) that:
“MTA’s relationship to LIRR is not limited to its status as stockholder of a subsidiary. While LIRR’s own employees are responsible for running the trains and collecting the fares, there is more to ‘the management and operation of the business,’ 45 U.S.C. § 51, of a railroad than operation of the transportation facilities themselves. MTA, as described above, is directly and integrally involved in essential business aspects of LIRR operations, as well as in providing police services that are directly in furtherance as LIRR’s business as a railroad.”
The Appellate Division, Second Department, cited Greene in Linetskiy v New York City Tr. Auth. (2 AD3d 503 [2003]), holding that FELA doesn’t apply to TA employees because the TA is not a common carrier for FELA purposes, only carrying passengers within New York City. The Court (at 504) observed that FELA is applicable to Metro-North, which operates across state lines, and “the Long Island Rail Road which operates solely in the State of New York (see Greene v Long Is. R.R. Co., 280 F3d 224 [2002], cert denied sub nom. Metropolitan Transp. Auth. v Greene, 538 US 1031 [2003]; Grasso v Long Is. R.R., 306 AD2d 378 [2003]).”
Further, the Second Department observed (at 504) that:
“[U]nlike the TA, the Long Island Rail Road is classified as a railroad which is involved in interstate commerce (see Long Is. R.R. Co. v Department of Labor of State of N.Y., 256 NY 498 [1931]), and the transportation of freight (see People ex rel. Sibley v Gresser, 205 NY 24, 26 [1912]) in interstate commerce (see Matter of Fabregas v Staten Is. R.T. Ry. Co., [7 AD2d 948 (1959)], supra; see also Long Is. R.R. Co. v International Assn. of Machinists & Aero *752 space Workers, 709 F Supp 376, 378 [1989], mod on other grounds 874 F2d 901 [1989], cert denied 493 US 1042 [1990]). The New York City transit system, on the other hand, carries only passengers in the City of New York.”
Therefore, the arguments of the MTA that it should be dismissed from the instant action are disingenuous. The MTA has been previously held to be the owner and operator of the LIRR, a common carrier in interstate commerce, subject to FELA actions. Unlike attempted FELA actions by TA employees, in which the MTA can engage in its usual obfuscation, hiding behind the opaque curtain that the Legislature created for it in Public Authorities Law § 1266 (5), LIRR employees can bring FELA actions to attempt to redress the alleged wrongs of the LIRR and its owner and operator, the MTA. Just as the Wizard of Oz was forced to come out from behind the curtain, the transparency provided by FELA compels the MTA, as the owner and operator of the LIRR, to come out from behind the legal curtain of Public Authorities Law § 1266 (5), used by the MTA to hide from FELA actions by LIRR employees. Therefore, the MTA is a proper defendant in the instant FELA action.
Summary Judgment Standard
The proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case. (Alvarez v Prospect Hosp., 68 NY2d 320 [1986]; Zuckerman v City of New York, 49 NY2d 557, 562 [1980]; Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [1957].) Failure to make such a showing requires denial of the motion, regardless of the sufficiency of the opposing papers. (Matter of Redemption Church of Christ of Apostolic Faith v Williams, 84 AD2d 648, 649 [3d Dept 1981]; Greenberg v Manlon Realty, 43 AD2d 968, 969 [2d Dept 1974]; Winegrad v New York Univ. Med. Ctr., 64 NY2d 851 [1985].)
CPLR 3212 (b) requires that for a court to grant summary judgment the court must determine if the movant’s papers justify holding as a matter of law that “the cause of action or defense has no merit.” The evidence submitted in support of the movant must be viewed in the light most favorable to the nonmovant. (Marine Midland Bank v Dino & Artie’s Automatic Transmission Co., 168 AD2d 610 [2d Dept 1990].) Summary judgment shall be granted only when there are no issues of ma *753 terial fact and the evidence requires the court to direct judgment in favor of the movant as a matter of law. (Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065 [1979].)
Denial of Motion and Cross Motion for Summary Judgment
In viewing the evidence submitted by defendants in favor of that branch of their motion for summary judgment and dismissal of plaintiffs action, and by plaintiff in her cross motion for summary judgment, in the light most favorable to the non-moving party, this court finds that there are triable issues of material fact.
Defendants, in their motion for summary judgment, attack the opinions of Dr. David Kamelhar (motion, exhibit G, report of Apr. 25, 2001 upon examination of Mr. Pappalardo [despite the sloppy labeling by defendants’ counsel in its affirmation in support of motion, as exhibit F of motion]) and Dr. R. Michael Kelly (motion, exhibit I, affirmation of Dr. Kelly [despite the continued sloppy labeling by defendants’ counsel in its affirmation in support of motion, as exhibit H of motion]). Dr. Kamelhar, plaintiffs pulmonologist, concluded that Mr. Pappalardo “provides a history consistent with regular and prolonged asbestos exposure”; “has an additional risk related to cigarette smoking”; and “radiographic changes consistent with asbestos-related pleural abnormalities.” Defendants assert that Dr. Kamelhar didn’t define “regular and prolonged asbestos exposure” or compare decedent’s exposures to hazardous substances with scientific data. Defendants failed to note that Dr. Kamelhar attached to his report several pages of numerous objective findings with respect to various pulmonary functions of Mr. Pappalardo. The opinions of Dr. Kelly, an internist and expert on occupational illnesses, are skewered by defendants because Dr. Kelly never examined decedent, and his opinions are based upon his review of medical records and decedent’s deposition. Further, defendants claim that Dr. Kelly’s findings do not quantify decedent’s exposure to hazardous materials. Defendants claim that plaintiff failed to meet the burden set forth in Frye v United States (293 F 1013 [DC Cir 1923]) by not demonstrating that the opinions of her experts are generally accepted as reliable. New York follows the Frye standard, as elaborated in People v Wesley (83 NY2d 417 [1994]).
This argument of defendants, that summary judgment should be granted and the action dismissed for plaintiff’s failure to quantify exposure of decedent to hazardous materials, is based *754 solely upon defendants’ counsel’s affirmation in support of the motion. Defendants failed to present any evidence in admissible form, such as affidavits from their experts, that would warrant this court, as a matter of law, to grant summary judgment to defendants. Counsel for defendants supports the motion for summary judgment with an attorney’s affirmation, which states in paragraph 1 of the affirmation in support of the motion that “I am fully familiar with the facts and circumstances of this matter.” However, in a CPLR 3212 motion for summary judgment, an affirmation by an attorney who has no personal knowledge of the facts has no evidentiary value. (Zuckerman v City of New York, supra; Stahl v Stralberg, 287 AD2d 613, 614 [2d Dept 2001]; Spearmon v Times Sq. Stores Corp., 96 AD2d 552, 553 [2d Dept 1983].) Professor David Siegel, in New York Practice § 281 (at 464 [4th ed]), instructed that:
“Affidavits on any motion should be made only by those with knowledge of the facts, and nowhere is this rule more faithfully applied than on the motion for summary judgment. The attorney’s affidavit, unless the attorney happens to have first-hand knowledge of the facts — which is the exception rather than the rule — has no probative force.”
Therefore, that branch of defendants’ motion for summary judgment and dismissal of the instant action must be denied. Additionally, defendants failed to submit any evidence to show that decedent had a reasonably safe workplace or that decedent’s alleged occupational illnesses and death were not caused by defendants’ negligence. (See Alvarez v Prospect Hosp., supra; Winegrad v New York Univ. Med. Ctr., supra.)
In Frye (supra at 1014), the court observed:
“Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.”
As noted above, defendants in the instant action present no scientific evidence to refute the findings of Drs. Kamelhar and Kelly. In Drago v Tishman Constr. Corp. of N.Y. (4 Misc 3d 354, 362 [Sup Ct, NY County 2004]), the court observed that to have *755 a Frye hearing with respect to the findings of experts, the moving party has to justify “the need for a Frye hearing by showing a lack of scientific support on relevant issues.” An attorney’s affirmation by itself is insufficient to show “a lack of scientific support on relevant issues.” The Court of Appeals instructed, in Friends of Animals v Associated Fur Mfrs. (supra at 1067), that:
“To obtain summary judgment it is necessary that the movant establish his cause of action or defense ‘sufficiently to warrant the court as a matter of law in directing judgment’ in his favor (CPLR 3212, suhd [b]), and he must do so by tender of evidentiary proof in admissible form.” (See Zuckerman v City of New York, supra; Alvarez v Prospect Hosp., supra.)
Defendants, at the trial of the instant case, will have their opportunity to attack the opinions of plaintiffs experts. In Daubert v Merrell Dow Pharmaceuticals, Inc. (509 US 579, 596 [1993]), Justice Harry Blackmun observed that courts and juries are capable of judging scientific evidence, instructing that “ [vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking . . . admissible evidence.”
Plaintiffs cross motion for summary judgment is based not only upon the opinions of Drs. Kamelhar and Kelly, but numerous documents and exhibits that are not specifically related to the instant case. For instance, plaintiff cites the July 9, 1996 deposition testimony of Donald F. Teague, Executive Director of System Safety, in connection with LIRR environmental litigation (cross motion, exhibit 1); Occupational Safety and Health Administration regulations (29 CFR 1910.1 et seq.) with respect to asbestos (cross motion, exhibit 2); the executive summary of Robert A. Keasbey Company with respect to asbestos abatement within the LIRR system and air monitoring, beginning in 1992, some eight years after the retirement of decedent (cross motion, exhibit 3); and other exhibits of general conditions with respect to asbestos and other possible hazardous materials and the LIRR. This is not enough for this court to make an ultimate issue determination and grant plaintiff summary judgment. The Appellate Division, Second Department, in Anyanwu v Johnson (276 AD2d 572, 572-573 [2000]), instructed that:
“Summary judgment is a drastic remedy and should not be granted where there is any doubt as to the *756 existence of a material and triable issue of fact (see, Rotuba Extruders v Ceppos, 46 NY2d 223, 231; Phillips v Kantor & Co., 31 NY2d 307, 311). Issue finding, rather than issue determination constitutes the key to the procedure (see, Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 401).”
Plaintiff will get her day in court, at trial, to prove if her father’s exposure to hazardous materials and the failure of defendants to provide a safe work environment contributed to her father’s demise.
Conclusion
Accordingly, it is ordered that the motion of defendants to dismiss the Metropolitan Transportation Authority as a defendant and for summary judgment and dismissal of plaintiffs action is denied; and it is further ordered that the cross motion of plaintiff for partial summary judgment on the issue of liability is denied.