**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 24-2515

_____


ESTATE OF JOHN SCHROEDER, BY AND THROUGH
DAWN TUCKER, ADMINISTRATRIX

Appellant

v.

PORT AUTHORITY TRANSIT CORP; DELAWARE
RIVER PORT AUTHORITY, jointly, severally, or in the
alternative

_____

Appeal from the United States District Court
for the District of New Jersey
(District Court No. 1:22-cv-01208)
District Judge: Honorable Edward S. Kiel

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on June 12, 2025

Before: CHAGARES, *Chief Judge*, PORTER, and AMBRO,
*Circuit Judges*

(Opinion filed August 26, 2025)

A. Michael Barker
Todd J. Gelfand
Barker Gelfand James & Sarvas
210 New Road
Linwood Greene, Suite 12
Linwood, NJ 08221

        Counsel for Appellant

Gregory F. Cirillo
Silvio A. Trentalange
Dilworth Paxson
1650 Market Street
Suite 1200
Philadelphia, PA 19102

        Counsel for Appellees

_____

OPINION OF THE COURT
_____

AMBRO, *Circuit Judge*

John Schroeder was crushed to death between two train cars while working as a technician for the Port Authority Transit Corporation (PATCO). The administrator of his estate, Dawn Tucker, sued PATCO and its owner, the Delaware River Port Authority (DRPA), under the Federal Employers Liability Act, 45 U.S.C. § 51 *et seq.* (FELA), to recover for Schroeder's death. FELA, however, applies only to "common carrier[s] by *railroad.*" *Id.* § 51 (emphasis added). The District Court held that PATCO's railway, known as the Speed Line, is not a railroad but an urban rapid transit system, and it dismissed

Tucker's FELA claim for lack of subject-matter jurisdiction. We agree that the Speed Line is not a railroad and thus affirm.

## I. BACKGROUND

### A. The Speed Line Provides Short-Haul Commuter Transportation Between Philadelphia, Pennsylvania and Lindenwold, New Jersey.

The Speed Line is a double-tracked rapid transit line running about 14.5 miles from 16th and Locust Streets in Philadelphia to Lindendwold, New Jersey. It began operating in January 1969, though it evolved out of the older Bridge Line, which connected Philadelphia and Camden as far back as 1936.

The Speed Line starts in Philadelphia and runs 1.7 miles underground before crossing the Delaware River for 1.5 miles on the Benjamin Franklin Bridge. It then runs underground again in Camden for 0.6 miles before returning aboveground for the remainder of its 10.7-mile route to Lindenwold. There are four stops in Philadelphia and nine stops in New Jersey.

The Speed Line currently operates 24/7/365. At its weekday-morning peak, a Philadelphia-bound train arrives at each stop about every six to eight minutes. At peak evening hours, Lindenwold-bound trains arrive every eight to ten minutes. The average run time between Lindenwold and Philadelphia is 28 minutes.

The Speed Line uses a third-rail electric system. That means its cars cannot run on tracks built for steam or diesel-powered trains, nor can those trains use the Speed Line's tracks. The Speed Line's trackage clearance requirements—that is, the minimum allowable distance between the tracks and surrounding structures—are also different from those of neighboring carriers, like the Southeastern Pennsylvania

3

Transit Authority (SEPTA) and New Jersey Transit (NJT), so those trains could not operate on the Speed Line's tracks.

No other rail carrier uses the Speed Line's tracks and vice versa. It does not carry freight, pay tariffs to Pennsylvania, or share operations or employees with any other rail carriers. Virtually all of PATCO's revenue comes from its Speed Line passenger transit service.

### B.    PATCO Leases the Lindenwold Yard and Uses It for Maintenance Projects.

DRPA owns a piece of property called the Lindenwold Yard, which it leases to PATCO for transit-car maintenance or refurbishment and similar operational projects. Near the Lindenwold Yard is a small portion of rail track called the Lindenwold Spur. In rail lingo, a spur is a short section of track that branches off from a main rail line, providing access to an industrial area. Spur Track (Commonly Called Spur), *Railroad Dictionary*, CSX, https://perma.cc/R979-6524.



The Lindenwold Spur diverges from the NJT's Atlantic City Line to the Lindenwold Yard and a nearby DRPA right-of-way. But no PATCO transit car or NJT train car has ever used the Lindenwold Spur to access the Lindenwold Yard. Nor has PATCO ever used the Lindenwold Spur to ship freight. In fact, PATCO has used it only once, over ten years ago, to perform maintenance on the Speed Line track between Lindenwold and

4

Camden. Specifically, PATCO contractors used the NJT track via the Lindenwold Spur to replace power poles and cables over the Speed Line track.

## C.    John Schroeder Was Killed While Working for PATCO at Lindenwold Yard and His Estate Sought Relief Under FELA.

John Schroeder was a 76-year-old electronics technician employed by PATCO. While working at the Lindenwold Yard in July 2020, he tragically was crushed to death between two transit cars. His daughter Dawn Tucker, as the administrator of his estate, sued DRPA and PATCO in March 2022. She asserted federal-law claims under FELA along with state-law tort claims.

PATCO and DRPA moved to dismiss Tucker's complaint for lack of subject-matter jurisdiction. FELA applies only to "common carrier[s] by railroad," 45 U.S.C. § 51, not other kinds of railways, like light rail, street cars, or rapid transit systems. According to PATCO and DRPA, the Speed Line is a rapid transit system, not a railroad, and thus outside FELA's scope. The District Court construed the motion as a factual challenge to its subject-matter jurisdiction, so it denied the motion without prejudice and allowed the parties to engage in jurisdictional discovery. After discovery closed, PATCO and DRPA renewed their motion to dismiss for lack of subject-matter jurisdiction. This time, the District Court granted their motion. It held that the Speed Line is a rapid transit system, not a railroad, and thus falls outside FELA's scope. Tucker timely appealed.

5

## II. JURISDICTION AND STANDARD OF REVIEW

Tucker invoked the District Court's federal-question jurisdiction over her FELA claim under 28 U.S.C. § 1331, and supplemental jurisdiction over her state-law claims under 28 U.S.C. § 1367. We have jurisdiction over the District Court's final order under 28 U.S.C. § 1291.

The District Court treated PATCO and DRPA's motion to dismiss as a factual challenge to its subject-matter jurisdiction. "[A] factual [Rule] 12(b)(1) challenge attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016). When assessing a district court's ruling on a factual challenge to subject-matter jurisdiction, we "exercise plenary review over [its] legal conclusions, [and] … review [its] findings of fact, including findings related to jurisdiction, only for clear error." *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016).

## III. RAILROADS AND TRANSIT SYSTEMS ARE DISTINGUISHED BY THE SERVICES THEY PROVIDE AND INFRASTRUCTURE THEY USE.

Tucker's sole basis for invoking federal subject-matter jurisdiction is her FELA claim.[1] That statute "provides the

---

[1] Tucker also asserted federal claims under the federal Locomotive Inspection Act, 49 U.S.C. § 20701 *et seq.*, and the Federal Safety Appliance Act, 49 U.S.C. § 20301 *et seq.*, but those statutes do not provide private rights of action. *Del. & Hudson Ry. v. Knoedler Mfrs., Inc.*, 781 F.3d 656, 663 (3d Cir. 2015) ("[N]either the [Locomotive Inspection Act] nor the [Safety Appliance Act] provide for private enforcement; instead,

exclusive source of recovery for employees of interstate railroads injured or killed during the course of their employment." *Felton v. Se. Pa. Transp. Auth.*, 757 F. Supp. 623, 626–27 (E.D. Pa.), *aff'd*, 952 F.2d 59 (3d Cir. 1991).

Though FELA does not define "common carrier by railroad," 45 U.S.C. § 51, we have recognized "a consistent congressional intent to distinguish between intraurban rail transportation and interstate railroads," which has guided our interpretation of FELA's coverage, *Felton*, 952 F.2d at 62. The Railroad Unemployment Insurance Act, for example, defines covered "employer[s]" as those who engage in "the transportation of passengers or property by railroad," but exempts "any street, interurban, or suburban electric railway." 45 U.S.C. § 351(a). The Locomotive Inspection Act similarly defines "railroad" as including "any form of nonhighway ground transportation that runs on rails or electromagnetic guideways" but *excluding* "rapid transit operations in an urban area that are not connected to the general railroad system of transportation." 49 U.S.C. § 20102(2).[2]

A plaintiff who seeks to recover under FELA must therefore prove that the defendant is a "common carrier *by railroad* engaged in interstate commerce" rather than a more

railroad employees can only enforce those statutes through … FELA.").

[2] This distinction between "railroads" and less industrial, localized rail-based transit systems is repeated throughout Congress's wide array of railroad legislation. *See, e.g.*, Railroad Retirement Act, 45 U.S.C. § 231(a)(2)(ii) ("[T]he term 'employer' shall not include … any street, interurban, or suburban electric railway, unless such railway is operating as part of a general diesel-railroad system of transportation ….").

localized "urban rapid transit system[], often referred to as subways or street railways." *Felton*, 952 F.2d at 62 (emphasis added) (quotation omitted). The parties agree on that much: FELA covers only railroads. They disagree, however, on how to distinguish between a railroad and a rapid transit system, and whether the Speed Line is the former or the latter.

The District Court ruled that "[t]he distinction between a railroad and urban rapid transit system can be 'explained … in terms of the *functions* and *services* performed.'" App. 7 (ellipsis in original) (emphases added) (quoting *Strykowski v. Ne. Ill. Reg'l Commuter R.R.*, 30 F.3d 136 (Table), 1994 WL 287395, at *6 (7th Cir. June 28, 1994)). In its view, the Speed Line is a rapid transit system, not a railroad, because it performs only short-haul passenger transportation, any interstate activity is merely incidental to its service of a single urban community, and it is not integrated with other rail lines. PATCO endorses this approach.

Tucker for her part argues that "urban rapid transit" refers only to "street railway and/or bus services on, over and under the streets of a single urban area." Appellant's Br. 15 (capitalization omitted). Although no case expressly endorses this formulation, she purports to synthesize it from a series of earlier cases—*Washington Railway & Electric Co. v. Scala*, 244 U.S. 630 (1917); *Mangum v. Capital Traction Co.*, 39 F.2d 286 (D.C. Cir. 1930); and *Ferguson v. Philadelphia Transportation Co.*, 113 F. Supp. 275 (E.D. Pa. 1952), *aff'd*, 205 F.2d 520 (3d Cir. 1953).

PATCO has the better argument. FELA-exempt urban rapid transit, though it may have its origins in the traditional street railcar system, is not as limited in scope as Tucker suggests. Case law interpreting the term "railroad" across the full range of federal legislation on the subject has identified

8

two touchstones. First, the railway's services: Does the railway perform long-haul passenger routes and interstate freight transportation?[3] Or high-capacity, frequent passenger transport for a single community? And second, its operations and infrastructure: Is the railway integrated with other rail traffic, including freight and intercity passenger trains? Or is it disconnected from other rail lines? These guideposts help identify the kinds of railways that Congress intended to regulate: those posing special hazards associated with heavy industry.

*Omaha & Council Bluffs Street Railway Co. v. Interstate Commerce Commission*, 230 U.S. 324 (1913), is an instructive early example of the Supreme Court's effort to distinguish urban rapid transit from industrial railroads.[4] The factors it considered fit neatly into our two categories. As for

---

[3] Courts have long recognized "that the length of [a rail company's] road or its track is not [to] be considered controlling in the determination of whether [FELA] is applicable." *Ferguson*, 113 F. Supp. at 276. But we must assess this factor to determine whether the railway "extend[s] from town to town" as a true "channel[] of interstate commerce" or merely operates as a "local" service for a "single community." *Omaha & Council Bluffs St. Ry. Co. v. Interstate Com. Comm'n*, 230 U.S. 324, 336 (1913).

[4] Though the Court was interpreting the meaning of "railroad" in the Interstate Commerce Act of 1887, "under the *in pari materia* canon of statutory construction, statutes addressing the same subject matter generally should be read 'as if they were one law.'" *Wachovia Bank v. Schmidt*, 546 U.S. 303, 315–16 (2006) (quoting *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972)).

services, "railroads are channels of interstate commerce." *Id.* at 336. And "the commerce to which Congress referred was that carried on by railroads engaged in hauling passengers or freight." *Id.* By contrast, "street railroads" are "aids to street traffic, and for the use of a single community, even though that community be divided by state lines, or under different municipal control." *Id.* "When these street railroads carry passengers across a state line they are, of course, engaged in interstate commerce, but not the commerce which Congress had in mind when legislating …." *Id.*

As for operations and infrastructure, "ordinary railroads are constructed on the companies' own property" with "tracks extend[ing] from town to town," "usually connected with other railroads, which themselves are further connected with others." *Id.* at 335–36. "Street railroads, on the other hand, are local, are laid in streets," and extend "from street to street, from ward to ward, from city to suburbs." *Id.* at 336.

We have extended this framework to FELA claims. In *Ferguson*—one of the cases Tucker invokes to support her narrower definition—the district court held that the Speed Line's predecessor, the Bridge Line, was a "street railway," not a railroad. 113 F. Supp. at 276. The services it provided did not involve the kind of interstate commerce that *Omaha & Council Bluffs* told us Congress was targeting: "No freight or mail [wa]s carried on any part of the defendant's system." *Id.*; *see also Linetskiy v. N.Y.C. Transit Auth.*, 2 A.D.3d 503, 504 (N.Y. App. Div. 2003) (characterizing Long Island Rail Road "as a railroad" because it "is involved in … the transportation of freight in interstate commerce"). Nor did the Bridge Line's infrastructure bear much resemblance to a railroad's. Although the Bridge Line had stops in New Jersey, those "locations [were] for the purposes of transportation practically part of the

10

City of Philadelphia and [were] but extensions of the city streetcar system." *Ferguson*, 113 F. Supp. at 276. It was not integrated with any other rail traffic either.

None of the cases Tucker cites support her capacious definition of railroad, nor her claim that rapid transit systems include only "street railway and/or bus services on, over and under the streets of a single urban area." Appellant's Br. 15 (capitalization omitted). For example, she emphasizes that *Mangum* involved a "street railway over the public streets and avenues of the District [of Columbia]." 39 F.2d at 288. Maybe so, but the considerations it deemed legally relevant were the same ones we have outlined here: "Speaking generally, … a street railway is local, derives its business from the streets along which it is operated, and is in aid of the local travel upon those streets." *Id.* at 287. By contrast, a "commercial railway"—that is, a railroad—"usually derives its business, either directly or indirectly, through connecting roads, from a large area of territory, and not from the travel on the streets of those cities, either terminal or way stations, along which they happen to be constructed and operated." *Id.* The D.C. Circuit used this framework to conclude that the railway before it was not a railroad. True, the defendant "operate[d] a trackage extending about a mile and a half into Maryland which is continuous with its line within the District." *Id.* at 288. But "th[o]se lines extend[ed] into adjacent urban neighborhoods, which for purposes of transportation are practically part of the city, and are but extensions of the city street car systems." *Id.* The line was not a railroad, so FELA did not cover it.

Tucker also leans heavily on *Scala*, but that case is likely bound to its facts. The Supreme Court there held that the defendant was operating a railroad, not a streetcar, because it "was incorporated as … a railway company, not a street

railway company," "had full powers of eminent domain," and extended between the District of Columbia and Maryland. 244 U.S. at 637–38. *Scala*'s reasoning is sparse and difficult to harmonize with later cases distinguishing between railroads and rapid transit systems. For example, in *Felton*—which we affirmed, 952 F.2d at 66—the district court observed that *Scala* "affirmed with little discussion a lower [c]ourt holding that a carrier incorporated as an ordinary railway company … was a 'suburban railroad common carrier of passengers' subject to … FELA." 757 F. Supp. at 630 (quoting *Scala*, 244 U.S. at 638). But "[o]ther authority," like *Mangum*, "support[ed] a contrary result." *Id.* And in *Ferguson*—another case we affirmed, 205 F.2d at 520—the district court held, despite *Scala*, that the Bridge Line was a street railway, not a railroad, even though it extended into New Jersey. 113 F. Supp. at 276.

### IV. THE PATCO SPEED LINE IS A RAPID TRANSIT SYSTEM, NOT A COMMON CARRIER BY RAILROAD.

To recap, we distinguish a railroad from other kinds of rapid transit by looking at its services and infrastructure. If a railway resembles the kind of industrial operation that Congress meant to regulate, then it is a railroad. Otherwise, it is a rapid transit system that falls outside FELA's scope. When we look at the Speed Line through this lens, it becomes clear that it is a rapid transit system, not a railroad.

A. **The Speed Line Performs Frequent Short-Haul Passenger Transportation and Does Not Transport Freight.**

Services first. The Speed Line does not perform long-haul passenger routes, nor does it transport freight. It instead provides high-capacity, frequent passenger transportation. At the time of our writing, it runs all day, every day. It served

12

4.9 million riders along its single line in 2022. It runs often—as frequently as every six minutes at peak commuting times. And it serves a single metropolitan area.

Tucker resists with several unpersuasive arguments. First, she claims that "the track connection at Lindenwold Yard was used for freight coming into the … Yard for PATCO's use for maintenance in the past." Appellant's Br. 7. But transporting power line equipment one time more than ten years ago is not the kind of freight transportation Congress had in mind. We agree with the District Court that this "single use" is "inconsequential." App. 9.

Second, Tucker claims that "hauling freight [versus] passengers is not the key distinguishing feature" of a railroad. Appellant's Br. 21 (capitalization omitted). If she means that whether a rail line transports freight does not alone answer our inquiry, then we agree. But, as explained, freight transportation is one of the hallmarks of a railroad. *See Chi. Transit Auth. v. Flohr*, 570 F.2d 1305, 1308–09 (7th Cir. 1977) (repeatedly identifying the hazards associated with transporting freight as one of the key objects of federal railroad legislation); *Omaha & Council Bluffs*, 230 U.S. at 336 ("[T]he commerce to which Congress referred was that carried on by railroads engaged in hauling passengers or freight ….").

The cases Tucker cites do not suggest otherwise. The railroad in *Scala* did not transport freight, but it "was incorporated as … a railway company." 244 U.S. at 637. DRPA, by contrast, is charged in its certificate of incorporation with "[t]he establishment, maintenance, rehabilitation, construction and operation of a *rapid transit system*." App. 104 (emphasis added). And while PATCO, like the railway company in *Scala*, possesses powers of eminent domain and has constructed some of its track on private rights of way, those

13

characteristics alone do not outweigh PATCO's non-industrial, single-community-focused, rapid transit services.

Tucker also notes that the parties in *Felton* did not dispute that the SEPTA Regional Division was a railroad, not a rapid transit system. But SEPTA's Regional Division is a special case because it was formerly part of the much larger Consolidated Rail Corporation (Conrail), no doubt a railroad under FELA. *See generally Consol. Rail Corp. v. Gottshall*, 512 U.S. 532 (1994) (applying FELA to injured Conrail employees). In 1981, Congress enacted the Northeast Rail Services Act (NERSA), which "mandated the withdrawal of Conrail from regional and interstate commuter rail service by January 1, 1983." *Felton*, 952 F.2d at 62. "Conrail's commuter rail properties were transferred to local transit authorities," including SEPTA. *Id.* Congress later amended the Rail Passenger Service Act (RPSA) to clarify that NERSA did not change the regulatory landscape for the former Conrail lines. We observed in *Felton* that "[u]nder the [RPSA amendments, 45 U.S.C.] § 591, commuter authorities such as SEPTA which assumed operation of regional lines became subject to all laws, including … FELA, previously applicable to Conrail … with regard to their commuter services." 952 F.2d at 63 (quoting *Felton*, 757 F. Supp. at 628) (first alteration in original); *see also* 45 U.S.C. § 1104(4) (defining "[c]ommuter service" as "short-haul rail passenger service operated in metropolitan and suburban areas").

**B.    The Speed Line Is Not Integrated with Other Rail Traffic.**

The Speed Line's operations do not look like a railroad's either. Perhaps most important, it is not meaningfully connected to any other railroads.

Tucker argues that PATCO connects to other rail carriers—NJT at the Lindenwold Spur and SEPTA because of its "fare arrangement connections." Appellant's Br. 25. But a "*de minimis* relationship to the operation of a railroad is insufficient to trigger … FELA." *Felton*, 757 F. Supp. at 631. No PATCO transit car or NJT train car has ever used the Lindenwold Spur to access the Lindenwold Yard. NJT and the Speed Line also have different power and trackage-clearance requirements, so their trains could not run on each other's tracks anyway.

The purported integration with SEPTA is even more tenuous. PATCO has "fare arrangement connections with SEPTA" and has apparently "twice offered Philadelphia Phillies fans from South Jersey an opportunity to ride the PATCO and … connect to the Broad Street Subway line." Appellant's Br. 25. But this argument misses the point. FELA focuses on hazards unique to industrial railroads. That PATCO and SEPTA's subway—not a railroad either—offered a special promotion to sports fans two times is irrelevant to our analysis.

## V. CONCLUSION

The grim reality that employees can be seriously injured by railroads and rapid transit systems alike is not lost on us. As other courts have sensibly observed, "the liability standard imposed by FELA in 1908" may be "an anachronism that has long outlived its usefulness." *Greene v. Long Island R. Co.*, 99 F. Supp. 2d 268, 275 (E.D.N.Y. 2000). But "until Congress acts to amend FELA," we "must apply the statute as written by Congress and interpreted by the Supreme Court." *Id.* That means distinguishing between railroads and rapid transit systems. The services and infrastructure of the Speed Line bear little resemblance to the former, and thus it falls outside FELA's scope. The District Court's judgment is affirmed.

15